533 So.2d 140 (1988)
Angela Rester, Wife of/and Richard F. ADAMS
v.
SECURITY INSURANCE COMPANY OF HARTFORD and James E. Mohon.
No. 87 CA 0931.
Court of Appeal of Louisiana, First Circuit.
October 12, 1988.
Writ Granted January 6, 1989.
*142 William M. Magee, Covington, for plaintiff-appellee Angela Rester, wife of Richard F. Adams.
John N. Gallaspy, Bogalusa, for Louisiana Farm Bureau Cas., appellee.
James E. Mohon, Houston, in pro. per.
Timothy G. Schafer, New Orleans, for defendant-appellant Security Ins. Co. of Hartford.
Anthony J. Clesi, Jr., New Orleans, for State Farm Mut. Auto. Ins. Co.
Before EDWARDS, SHORTESS and SAVOIE, JJ.
SAVOIE, Judge.
This is a personal injury action brought by a guest passenger and his spouse. Plaintiffs, Angela Rester wife of/and Richard Adams (hereinafter Adams), seek damages for injuries sustained by Adams in a one car accident which occurred on January 18, 1985. Plaintiffs filed suit against James E. Mohon, the driver of the vehicle, and Security Insurance Company of Hartford (hereinafter Security), the alleged insurer of the vehicle. Following trial, the jury found that Mohon and Security were liable and awarded Adams $72,000.00 in damages, and Angela Adams $5,000.00 in damages; the jury found Adams' comparative negligence to be 30%. Judgment was so rendered by the court.
On plaintiffs' motion for a judgment notwithstanding the verdict, the trial judge increased Adams' award to $150,000.00 and Angela's to $15,000.00.
Also named as a defendant in this suit was plaintiffs' uninsured motorist's carrier, Louisiana Farm Bureau Casualty Insurance Company (hereinafter Farm Bureau); Farm Bureau asserted a third party demand against the other defendants to recover under a conventional subrogation the $5,000.00 in medical payments it paid plaintiffs under their insurance policy. Following the trial, a judgment was rendered in *143 favor of Farm Bureau for $5,000.00 against defendants Mohon and Security.
From the trial court's judgment, Security appeals and plaintiffs answer the appeal.

FACTS
On December 12, 1984, Ray Lloyd, owner of a Metairie service station, West Esplanade Shell a/k/a America's Largest Shell (hereinafter Shell), arranged for the purchase of a 1984 Nissan 300ZX sports car. Rashan Lloyd, Lloyd's daughter, accompanied by Eileen Williams, his and Shell's bookkeeper, selected the car; the down payment on the car was in the form of a check written on Shell's account; the car's title was registered in the name of Shell; the car was financed by Shell through Nissan Motor Acceptance Corporation. On January 10, 1985, Eileen Williams requested Security, Shell's insurer, to add the vehicle to Shell's Business Auto Policy; by endorsement dated January 10, 1985 the vehicle was added to the policy. The policy provided liability coverage for any automobiles owned by Shell and collision coverage for vehicles specifically described in the policy.
On January 12, 1985, at his daughter's wedding reception in Bogalusa, Lloyd presented the car to Rashan and her new husband, James Mohon, as a wedding gift. The Mohons drove the car to Florida for their honeymoon. After the honeymoon, they returned to Bogalusa and stopped at Wild Bill's Fried Chicken House, the business the plaintiffs owned. Mohon and Adams went for a ride in the 300ZX. During the drive, Mohon lost control of the car in a curve; the car slid across and off the road, and came to rest after striking a small tree. The speed of the car prior to the accident and Adams' comments, if any, regarding the car's speed, are disputed.
Shortly after the accident, Adams went to Bogalusa Community Medical Center. Doctors diagnosed his injuries as comminuted fractures of the right transverse process at the L1, L2, L3, and L4 vertebra, and a contusion to the right side of the liver and kidney. Adams was hospitalized for two weeks. His liver and kidney condition cleared up within two or three days.
Adams was discharged from the hospital on February 1, 1985; he was given a brace to wear and told to remain inactive. In mid-March, his doctor allowed him to increase his activity and he began physical therapy.
In June, Adams decreased his physical therapy due to stomach problems. In August, Adams' treating physician advised him to continue physical therapy; Adams did so, but then again discontinued the physical therapy. At the time, he of trial had not resumed it.
In addition to medical personnel, Adams saw a psychologist, a vocational evaluation specialist, and a rehabilitation specialist. Adams was unable to permanently return to work at his fried chicken business; the restaurant closed in June. The vocational evaluation specialist recommended that Adams enroll in college.
In July of 1985, Adams sought treatment for a nodule on and a tingling sensation in his left arm; he was diagnosed as having a fibrous mass which caused pressure on the ulnar nerve. Surgery was performed to remove the nodule and relocate the ulnar nerve in March, 1986. Whether the ulnar nerve problem was caused by the January 1985 car accident is disputed.
Also disputed is the assessment of Adams' disability, with his treating physician assessing disability at 10% and with other physicians finding no disability.

ASSIGNMENTS OF ERROR
Security raises as assignments of error the following:
1. The jury erred in finding that Shell was the owner of the 300ZX and in failing to find that Ray Lloyd donated the 300ZX to the Mohons prior to the accident.
2. The trial court erred in its charge to the jury pertaining to ownership of the 300ZX.
3. The trial court erred in failing to grant Security's motion for a mistrial or to give the jury an admonition when the *144 Adams' attorney referred to the contents of inadmissable evidence.
4. The trial court erred in allowing an expert witness to give opinion testimony without first stating the facts upon which he based his opinion.
5. The trial court erred in granting the motion for judgment notwithstanding the verdict on the issue of damages.
6. The trial judge erred in failing to provide articulated reasons for increasing the damages awards to the plaintiffs.
7. The trial court erred in raising the damages awards to a sum other than the lowest reasonable amount.
8. The trial judge erred in awarding Farm Bureau an additional amount in recovery rather than deducting the amount from the Adams' damages awards.
9. The jury erred in awarding medical expenses to two expert witnesses.
Plaintiffs answered the appeal urging two assignments of error:
1. The trial court erred in failing to find that defendant, Richard Mohon, was solely at fault.
2. The trial court erred in failing to increase plaintiffs' damages awards to a greater amount.

ASSIGNMENT OF ERROR NO. 2
The judge's charge to the jury dealing with ownership and donation was as follows:
One of the issues in this case involves the ownership of the Datsun Nissan automobile which was being driven by James Mohon at the time of the accident. In Louisiana the sale and/or donation of automobiles and the true ownership of automobiles is determined by the provisions of the Louisiana Civil Code and not by the state's vehicle Certificate of Title Law. Compliance with the state's Certificate of Title Law serves as an administrative function and does not determine by itself ownership of the vehicle. However, it is the law of this state that the titled owner of an automobile, who buys a car for another because that person could not obtain credit, is the legal owner of the automobile even though the automobile was in the possession and complete control of the other party, and the owner's insurer cannot deny coverage on grounds that the owner had no insurable interest in the car.
One of the issues in this case that has been raised by Security Insurance Company of Hartford is the ownership of the vehicle in which the accident occurred. It is the law of this state that the certificate of title of an automobile constitutes prima facie proof that the named owner is the sole owner of marketable title to the vehicle. This means that in the absence of proof to the contrary, the registered owner of the vehicle is presumed to own it.
In Louisiana one may become the owner of an automobile by a manual gift. The manual gift of an automobile is accomplished by the giving of the automobile to another accompanied by the actual delivery of the automobile to another. No other formalities are necessary. However, there must be proof, by a preponderance of the evidence, that the donor clearly intended to divest himself of ownership at the time of the alleged manual gift.
It is the law of this state that every motor vehicle registered in this state shall be covered by an automobile liability policy and it is the duty of the registered owner of the motor vehicle to maintain this insurance. Failure to maintain liability insurance on a vehicle registered in this state shall subject the registered owner to penalties according to law.
A policy of insurance is a contract between the insurer and the insured and is to be enforced in accordance with the written provisions where those provisions are clear. Insurance contracts are not to be given strained, forced, or unreasonable applications. They should be considered in a fair, reasonable, and sensible manner, compatible with the apparent object and the plain intention of the parties as set forth in the words of the insurance contract.

*145 Once a plaintiff proves the existence of a policy of insurance sued upon, the burden shifts to the defendant insurer, who seeks to avoid liability, to establish facts upon which it disclaims liability or to show that its liability is limited or excluded.
Security contends that the court's charge concerning the effect of one person's purchase of a vehicle for another who could not obtain credit is particularly misleading. We agree. See Thomas v. Black & Decker (U.S.), Inc., 502 So.2d 157 (La. App.3d Cir.1987). While the charge is based on the case of Dugas v. Rogers, 285 So.2d 876 (La.App.1st Cir.1973), and does correctly summarize the holding in Dugas, we find it inapplicable to the facts of this case. At no time during the trial was there any testimony that Ray Lloyd was purchasing the car for Mohon because Mohon could not obtain credit. The charge gives rise to the inference that perhaps this was a factor in the purchase, and based on this, the jury could have determined that Shell owned the car.
Security also contends that the jury charge that the registered owner of a vehicle is legally obligated to provide insurance is inapplicable to the issue of ownership. We disagree. While the act of maintaining insurance on a vehicle is not determinative of ownership, it is a factor which may be considered in deciding ownership.
In a jury trial, the judge must give instructions which properly reflect the law applicable in light of the pleadings and facts in each particular case. Beck v. Lovell, 361 So.2d 245, 250 (La.App.1st Cir.), writ denied, 362 So.2d 802 (La.1978). If the instructions are confusing or misleading, the instructions constitute error. Beck, 361 So.2d at 250.
Although each charge on ownership, certificate of title, and donation is a correct statement of the law, the charges as a whole give much greater weight to the certificate of title than is legally proper. According to the initial statement in the charge, the jury was not to determine ownership according to the state's vehicle certificate of title law; the jury was then instructed that under a particular factual circumstance, the titled owner is the legal owner. The judge went on to tell the jury that the title constitutes prima facie proof that the named owner is the sole owner of marketable title. The jury was then told that a person may become the owner of an automobile by manual gift.
According to our jurisprudence, Louisiana's Vehicle Certificate of Title law is an administrative proceeding and does not bear any essential relationship to transfers of motor vehicles under the provisions of the Civil Code, i.e., sales and donations inter vivos. Morris v. National Dairy Products Corporation, 160 So.2d 371, 374 (La.App.4th Cir.1964); Scott v. Continental Insurance Co., 259 So.2d 391, 394 (La. App.2d Cir.1972). To accomplish a donation inter vivos by manual gift accompanied by real delivery under LSA-C.C. art. 1539, the donor's will to give and actual possession of the movable property by the donee must operate simultaneously. Mitchell v. Mitchell, 489 So.2d 483, 486 (La.App.3d Cir.1986). The burden of proving that a donation was made rests on the party alleging the donation, who, by strong and convincing proof, must establish both that the donor intended to presently and irrevocably divest himself of the thing and that delivery actually took place. Pardue v. Turnage, 383 So.2d 804, 805 (La.App.1st Cir. 1980). Bergeron v. Bergeron, 411 So.2d 1183, 1187 (La.App.4th Cir.1982). "Any admissable evidence may be used to prove a manual donation, and outward acts by the alleged donor, together with the relationship of the parties, is [sic] of weighty import." Pardue, 383 So.2d at 805. (Citations omitted).
We find that as between the parties, the registered owner on the certificate of title can be considered as evidence in determining whether a manual donation occurred; however, one should not look first to the title and then secondly to whether a donation occurred to determine ownership. We find that the jury instructions were confusing and misleading because they overemphasized the certificate of title.
*146 We must now determine whether the improper charges contributed to the verdict. Picou v. Ferrara, 483 So.2d 915, 918 (La.1986). If the erroneous charges contributed to the verdict, no weight should be given to that portion of the verdict. Picou, 483 So.2d at 918; McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986). In such instance, the appellate court must make an independent review of the record in order to determine which party should prevail on that issue by a preponderance of the evidence. Picou, 483 So.2d at 918; McLean, 495 So.2d at 1304.
We find that the unclear charges did contribute to the jury verdict; the charges emphasized the titled owner as the legal owner of the vehicle, and the jury did find the titled owner to be the legal owner. We are unable to state with any degree of certainty that the jury would have rendered the same verdict had it been given the proper charges. See, McLean, 495 So. 2d at 1304. However, upon making an independent review of the facts, we find that no manual gift occurred, and that Shell, the titled owner, was the owner of the vehicle.
Security points out that Rashan Lloyd Mohon selected the car, and that the car was intended to be a wedding gift. Security introduced pictures from the wedding reception which show Ray Lloyd handing the car keys over to Mohon; the pictures show the car wrapped up in a huge bow, and a large card attached which reads "To Emile and Rashan Best Wishes from Stephanie and Ray." Security points out that according to the insurance policy, the car was to be garaged in Metairie whereas Mohon testified that the car was to be garaged in Houston where the Mohons were to live and that the car was not to be and never used in the Shell business. Mohon also testified that while he previously worked for Shell, he did not do so immediately prior to or after the marriage.
Evidence showed that not only did Ray Lloyd insure the vehicle under Shell's policy, he also added Mohon's name to the insurer's list of drivers. When the car was repaired after the accident, Shell paid the deductible. Title was transferred to Mohon on April 20, 1985, following the repair of the car. At that time, Mohon assumed the payments on the car to Nissan Motor Acceptance Corporation. The financing agreement Lloyd signed for the car required that NMAC consent to the transfer of the vehicle. NMAC did so on April 20, 1985.
Based on the evidence, we find that Security failed to establish by strong and convincing proof that Ray Lloyd intended to presently and irrevocably divest Shell of ownership of the vehicle at his daughter's wedding. Lloyd's retention of title to the vehicle in Shell's name and his maintenance of insurance on the vehicle under Shell's policy are acts by Lloyd which show that his intent was to retain ownership in Shell while his daughter and son-in-law were to have the use and possession of the vehicle.
For these reasons, we find Assignment of Error No. 1 to have merit; we do not reverse because our independent fact finding leads us to determine that Shell was the owner of the vehicle.

ASSIGNMENTS OF ERROR NOS. 1, 3, and 4
Based on our ruling on Assignment of Error No. 2 which required us to set aside the jury's finding as to ownership of the vehicle, and based on our independent determination that no donation of the vehicle occurred, we pretermit discussion on Assignments of Error Nos. 1, 3, and 4 since they deal with the same issue.

ASSIGNMENTS OF ERROR NOS. 5, 6 and 7; PLAINTIFFS' ASSIGNMENT OF ERROR NO. 2
Security contends that the trial court erred in granting the plaintiffs' motion for a judgment notwithstanding the verdict (JNOV) under LSA-C.C.P. art. 1811.
The trial judge increased the following awards to the Adams:

 ITEM JURY JUDGE
Past pain and suffering, $10,000.00 $50,000.00
 physical and mental
Future pain and suffering, $ 5,000.00 $15,000.00
 physical and mental

*147
 ITEM JURY JUDGE
Future loss of $ 4,000.00 $15,000.00
 wages/earning capacity
Permanent disability $ 3,000.00 $20,000.00
Loss of consortium $ 5,000.00 $15,000.00

A JNOV should be granted when:
`the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict.... On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied...'. Scott v. Hospital Service District No. 1 of the Parish of St. Charles, 496 So.2d 270, 273, 274 (La.1986).
"[T]he trial court may not weigh the evidence, pass on the credibility of the witnesses, or substitute its reasonable inferences of the facts for those of the jury." Webb v. Goodley, 512 So.2d 527, 530 (La. App.3d Cir.1987) (Citations omitted).
In this case, we find that the trial court erred in granting a JNOV on certain items of damages. In our opinion, the evidence does not point so strongly and overwhelmingly in favor of the plaintiffs that reasonable men could not reach different conclusions.
The plaintiffs introduced exhaustive and extensive testimony concerning their damages. We will first review the testimony concerning Adams' past and future pain and suffering, disability, and loss of consortium. Adams testified that while hospitalized, he was in pain; that he was immobilized for three to four days; and that after that he could only walk with assistance. He wore a brace from the time of his discharge from the hospital on February 1, 1985 through October of 1985. He testified that before the accident he hunted, fished, played softball, drove a three wheeler, and wrestled and played with his three year old nephew. He said that after the accident, he could not engage in these activities as it was too painful. Adams also did household and yard work before the accident; he and his wife lived with her parents. After the accident, Adams could no longer perform his chores. Adams also worked at and managed Wild Bill's Fried Chicken House with Angela; he testified that he had to close the restaurant because he was unable to do the work. At the time of trial (September, 15-18, 1986), he was working part time at a video rental store where he was able to sit down frequently.
Adams also testified that since the accident he had problems with his temper and anger and with sleeping, which he said caused he and his wife to move out of his in-laws' trailer, and into a trailer of their own. Due to his mental health problems, he began seeing a psychologistDr. Morgan. Adams also said that he had pain during sexual intercourse, and that his social life had suffered since the accident.
Several physicians testified. Dr. Daniel Sinclair, the orthopedist who treated Adams after the accident, testified that the plaintiff complained of pain from his initial visit (January 28, 1985) through his latest visit (August 13, 1986) to Dr. Sinclair. However, there were no objective symptoms to support Adams' complaints of pain following Adams' visit on January 28, 1985, ten days after the accident. Dr. Sinclair told Adams he could return to work in mid-March of 1985 and he could engage in light activity. In May, Adams underwent testing at Ochsner Hospital; all the test results were normal. Adams began physical therapy at this time although he discontinued it in mid-June because he thought he had an ulcer; however, he saw a gastroenterologist, Dr. Drude, who found no ulcer. In mid-June, x-rays taken by Dr. Sinclair showed that the fractures in plaintiff's back had healed. On July 1, 1985, Dr. Sinclair advised plaintiff that he no longer needed to wear his brace, although as Adams earlier testified, he wore the brace for three more months. At some point in the summer, Adams returned to physical therapy, but he discontinued it sometime after August; when Dr. Sinclair saw Adams on October 14, 1985, he advised him to return to physical therapy.
In July of 1985, Adams told Dr. Sinclair he was having problems with his left arm; *148 Dr. Sinclair found a nodule on Adams' left arm, and diagnosed his ulnar nerve problem. When questioned at trial concerning his opinion as to whether the accident caused plaintiff's ulnar nerve problems, Dr. Sinclair testified that it was his opinion the accident did not cause the problem because it appeared too long afterwards.
When asked about Adams' disability, if any, Dr. Sinclair said that fractures such as plaintiffs' would normally heal in four to six months; he opined that as a result of the back injury, Adams had a 10% anatomical disability. There was no disability due to plaintiff's ulnar nerve. Dr. Sinclair said that the 10% disability would not interfere with Adams' activities, and that three months of physical therapy would take care of the disability.
Dr. Evan Howell, plaintiff's neurologist, also testified. Dr. Howell said that in his examinations, he could detect no abnormalities or make any objective findings, although Adams continually complained of pain. Dr. Howell testified that plaintiff's ulnar nerve problem was not due to the car accident. Dr. Howell also found that Adams was not disabled.
Security called two physicians to testify who had examined Adams at their request. Dr. James Williams, an orthopedist, examined Adams on July 14, 1986. Although plaintiff also complained of pain to him, the only objective finding that Dr. Williams made is that plaintiff's stiffness limited his range of motion. Dr. Williams found that plaintiff's fractures were healed, but that Adams needed physical therapy. He also said that had Adams not discontinued the physical therapy, he would have made a full recovery. Dr. Williams did not assign any anatomical disability to Adams. Dr. Williams opined that plaintiff's ulnar nerve problems were not caused by the accident, either directly or indirectly.
Dr. William Martin, a neurologist, examined plaintiff on July 24, 1986, and as with the other doctors, found no objective symptoms to support plaintiff's complaints of pain. He also did not assign any percentage of disability to plaintiff. Dr. Martin, after examining plaintiff's medical records, testified that he could find no indication that Adams was suffering the headaches that he claimed caused him to discontinue his physical therapy in August. Dr. Martin testified that plaintiff's ulnar nerve problems were not due to the accident.
Dr. James Morgan, Adams' psychologist, testified that he began seeing Adams on December 9, 1985. He diagnosed Adams as suffering from Post Traumatic Stress Disorder due (PTSO) to the accident. PTSO manifests itself in anxiety, nervousness, irritability, short temper, trouble in sleeping, and withdrawal from others. Dr. Morgan said that he based his diagnosis on Adams' statements during their sessions; he also opined that Adams was not a malingerer. He did state that Angela told him that Adams was reluctant to do things of which she thought he was capable. In response, Adams told Dr. Morgan that he could not do these things because he anticipated the pain it would cause. Dr. Morgan testified as to the effect of the accident and PTSO on the Adams' marriage. He felt that the accident had brought plaintiffs closer together; that the accident decreased the time the couple spent together because they no longer worked together; and that their sex life had decreased due to Adams' pain. Dr. Morgan recommended six months to one year of therapy for Adams.
Dr. Voogt, a rehabilitation specialist, testified that he recommended in order for Adams to be rehabilitated, that Adams see a physiatrist; continue his medical treatment; continue physical therapy; begin occupational therapy, sexual psychotherapy, and physical conditioning; see a psychologist; undergo a vocational evaluation; hire a handyman and have a spa built. On cross-examination, Dr. Voogt admitted that he saw Adams in the winter of 1985, and that if Adams after proper physical therapy totally recovered, the recommendations would not apply.
Several lay witnesses also testified for plaintiffs. Angela testified that her husband became angry, rude, and subject to temper outbursts after the accident. She said that their marriage had become *149 strained and that she and her husband had had to move out of her parents' home due to his temper. Angela said that her husband complained of pain daily and that his social, recreational, and household activities had decreased after the accident. She testified that she and her husband no longer spent as much time together since they closed the restaurant they both owned and operated. She said that their sex life was not as good following the accident.
Plaintiff's father, Richard Adams, testified that when he saw plaintiff in the emergency room after the accident, Adams was in intense pain. He said that his son's activities following the accident decreased. He testified that his son's attitude after seeing the psychologist improved, and that in general, he had seen improvement in his son since the accident.
Reviewing the testimony, we find that reasonable persons could differ as to the amounts plaintiffs should be awarded for their damages for pain and suffering, disability, and loss of consortium. While the plaintiff chose to present himself as suffering in pain continually since the accident, the jury chose not to believe the plaintiff. Other than on one occasion soon after the accident, no objective findings of injury were made. Adams underwent no surgery on his back; the fractures healed in five to six months; Adams' disability was minor and could be ameliorated by physical therapy; Adams stopped the physical therapy twice for reasons not totally supported by medical records; and four of the five treating physicians testified that the accident did not cause the ulnar nerve problem.
We must now determine whether the trial judge erred in granting the JNOV as to Adams' future loss of wages or earning capacity. Reviewing the testimony concerning Adams' future loss of wages or earning capacity, we again find the trial judge erred.
Bobby Roberts, a vocational evaluation specialist, testified that based on Adams' medical reports and an interview with Adams on September 24, 1985, where he noted that Adams had difficulty sitting and standing, he recommended that Adams return to college. He opined that Adams' present employment at a video store was sheltered employment. When it was pointed out during questioning that Adams had attended LSU for one and a half years following high school and that he had been scholastically dropped, Roberts said that he could only say that Adams was capable of performing in college.
Dr. Randolph Rice, an expert economist, testified that Adams' lost income or earning capacity from January 1, 1985 through trial was $22,357.00. He based his calculations on the 1984 income from Wild Bill's, which was $13,080.00 according to Adams' attorney. We note that the records from 1984 show Wild Bill's profit to be $12,107.00; for the six months the restaurant was open in 1985, the net profit was $423.00. Adams testified that he was forced to close the restaurant in June, 1985 due to his inability to operate the restaurant because of his injuries. Dr. Rice then testified as to the amount of money Adams would need to replace his lost income if he were to undergo physical therapy and return to college; that amount was $53,805.00.
Based on this evidence, we find reasonable minds could differ on Adams' future loss of wages; the jury could have based its award on Adams' profit on Wild Bill's in 1984; according to the 1984 figure, the restaurant was netting $1,000.00 per month. If the jury believed that Adams should not work during his three months of physical therapy, the award of future loss wages of $4,000.00 is adequate. We note that we do not find that the jury abused its much discretion in the $4,000.00 award. For these reasons, Security's Assignment of Error No. 5 has merit; the action of the trial court in granting the JNOV is reversed; because of our ruling on Assignment of Error No. 5, we need not discuss Assignment of Error Nos. 6 and 7.[1] *150 ASSIGNMENT OF ERROR NO. 8
Security contends that the trial court erred in awarding Farm Bureau $5,000.00 against it. The basis of its contention is that the plaintiffs were awarded virtually all past medical expenses ($21,000.00) for Adams' back injuries by the jury; according to Security, to require it to pay the $5,000.00 to Farm Bureau would be allowing plaintiffs a double recovery since plaintiffs subrogated Farm Bureau to their claim for medical expenses in the amount of $5,000.00.
At trial, Farm Bureau and plaintiffs agreed to stipulate that Farm Bureau had paid $5,000.00 of plaintiffs' medical expenses under the medical pay provision of its policy; that it was not necessary for Farm Bureau to introduce evidence of payment; and that Adams' conventionally subrogated Farm Bureau to that portion of his claim. Thus, Farm Bureau presented no evidence of the medical expenses which it paid. Likewise, Adams introduced evidence of all medical bills without specifying which Farm Bureau had paid.
We agree with Security's contention and find that based on the stipulation and subrogation, the subrogated medical payments claim of Farm Bureau should be paid from plaintiffs' award for past medical expenses, and not as an additional amount. For these reasons, Assignment of Error No. 8 has merit, and the judgment will be amended accordingly.

ASSIGNMENT OF ERROR NO. 9
Security agrees that the jury erred in including in its award for past medical expenses the fees of Dr. Voogt and Roberts because they were not treating Adams but instead were aiding Adams in preparing for his lawsuit.
A review of the evidence submitted of Adams' medical expenses shows that the jury only awarded Adams the medical expenses connected to his back problem and made no award for the expenses associated with his ulnar nerve problem; the jury did include in its award fees of $6,040.57 for Dr. Voogt and $506.25 for Roberts.
Items of medical expenses not incurred for treatment but rather in the preparation of the case for trial are not recoverable. Noland v. Liberty Mutual Insurance Co., 96 So.2d 360, 362 (La.App. 1st Cir.1957); McCrory v. Great American Indemnity Co., 92 So.2d 742 (La.App.2d Cir.1957). Dr. Voogt and Roberts saw Adams to determine the work he could perform after the accident, and not for medical reasons. Accordingly, we find that the rationale of Noland applies since they only rendered services to Adams related to litigation. Expenses clearly incurred as an incident of trial are no more an allowable item of damage than would be attorney fees. See Noland, 96 So.2d at 362.
Adams was referred to both Dr. Voogt and Roberts by his attorney; he saw Roberts once and Dr. Voogt twice. Both men made recommendations to Adams, as earlier described; yet neither rendered any type of necessary treatment to Adams. For these reasons, we find the jury erred in awarding these expenses because they were incurred by Adams in preparation for litigation; Assignment of Error No. 9 has merit and we will modify the judgment accordingly.

ASSIGNMENT OF ERROR NO. 1
Plaintiffs argue that the jury erred in finding Adams 30% negligent.
According to the jurisprudence,
`when the guest permits the driver to be reckless without protesting he will be considered to have consented to and acquiesed in the driver's negligence if he had an opportunity to protest, and ... such failure to protest on the part of the guest amounts to contributory negligence....' As a guest or passenger in an automobile, it was his duty to warn the driver of the danger, and otherwise exercise ordinary care to protect himself.... It ... is the duty of a guest, or *151 passenger in a motor vehicle ... where reasonable necessary to warn the driver of impending danger and to take such other reasonable steps as are necessary for his protection.
Duhe v. Cali, 236 So.2d 292, 294 (La.App. 4th Cir.1970). (Citations omitted).
Findings of the trial court may not be set aside unless review of the record establishes that they are clearly wrong or manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). "The trier of fact, actually hearing and observing the witnesses give live testimony, is in a better position to evaluate credibility than a reviewing court or an intermediate level, which at best can only study the written words of a cold record." Burbank v. LeBeouf, 471 So.2d 980, 982 (La.App. 1st Cir. 1985). (Citations omitted).
Reviewing the record, we can not say that the jury erred in finding Adams to be negligent. At trial, he testified that after Mohon turned onto the highway on which the accident occurred, he began to accelerate. Adams explained that he did not object to the speed of the vehicle because: the vehicle did not seem to be going that fast; Mohon appeared to be in control of the vehicle; and Adams did not feel that he was in any danger. The jury obviously felt that this trial testimony was inreconciable with Adams' deposition testimony. At his deposition, Mr. Adams explained that he did not protest because the vehicle was going so fast that he went into a state of shock. According to Adams, he had never before gone that fast.
The jury must have felt that Adams had ample opportunity to voice a protest had he chosen to do so and that neither of his excuses for not objecting were credible. Accordingly, the jury's assessment of fault on the part of Adams is supported in law and evidence. For these reasons, plaintiffs' Assignment of Error No. 2 has no merit.
For the above and foregoing reasons, we reverse the trial court's granting of plaintiffs' motion for a judgment notwithstanding the verdict under LSA-C.C.P. art. 1811, and reinstate the jury's determination subject to the following amendments:
1. We delete the awards of medical expenses to Dr. Voogt and Roberts.
2. We delete the special award to Farm Bureau of an additional $5,000.00 for plaintiffs' medical expenses.
Plaintiff is to pay all costs.
REVERSED IN PART, AMENDED IN PART AND AS AMENDED AFFIRMED.
SHORTESS, J., concurs.
EDWARDS, J., concurs with reasons.
EDWARDS, Judge, concurring.
I concur in the result reached and write to clarify only one issue presented to this court. Defendant, Security Insurance Company, has attempted to deny coverage saying that they do not insure the automobile because it was not an "owned automobile" as required by the policy. They contend it was not an "owned automobile" because the automobile was donated and no longer owned by their insured.
In order to accomplish a donation inter vivos by manual gift accompanied by real delivery under LSA-C.C. art. 1539, the donors will to give and actual possession of the movable property by the donee must operate simultaneously. Mitchell v. Mitchell, 489 So.2d 483 (La.App. 3d Cir.1986). Here, though Ray Lloyd did in fact turn over the keys to the automobile in a ceremony at the wedding reception, he did not in fact intend to transfer ownership at that moment, but did so only to provide an aesthetically pleasing ceremony for his daughter and new son-in-law. As the intent to donate and delivery were not in fact simultaneous, no donation took place until the later time of the actual transfer of registration. Mr. Lloyd surely did not intend to allow his daughter and son-in-law to go without insurance. With this clarification only, I concur in the result.
NOTES
[1] In granting the JNOV, the trial court also granted a new trial on the issue of damages in the event that this court vacated or reversed the JNOV, pursuant to LSA-C.C.P. art. 1811 C (1). However, under LSA-C.C.P. art. 1811 C (2), this court has the authority to modify the trial court's order. Accordingly, because we have reinstated the jury verdict, a new trial is unnecessary.