543 So.2d 480 (1989)
Angela Rester, wife of/and Richard F. ADAMS
v.
SECURITY INSURANCE COMPANY OF HARTFORD and James E. Mohon.
No. 88-C-2762.
Supreme Court of Louisiana.
May 1, 1989.
William M. Magee, Covington, for applicant.
Timothy G. Schafer, New Orleans, Anthony J. Celesi, Jr., John N. Gallaspy, Bogalusa, James E. Mohon, for respondent.
WATSON, Justice.
In this personal injury suit, Richard Adams and his wife, Angela Rester, seek damages for injuries sustained by Adams in a one-car accident on January 18, 1985. Adams was a guest passenger in a vehicle driven by defendant, James Emile Mohon. The trial jury concluded that Security Insurance Company of Hartford was the insurer of the vehicle and that Mohon and Security were liable for $72,000 in damages to Adams and $5,000 in damages to Angela Rester Adams.[1] The jury decided that *481 Adams was thirty percent at fault, and the damages were reduced by that percentage of comparative negligence.[2] The result was an award of $3,500 to Angela Adams and $45,000 to her husband.
On plaintiffs' motion for judgment notwithstanding the verdict,[3] the trial judge increased Adams' award to $150,000 and Angela's to $15,000[4] but did not disturb the allocation of fault between the guest passenger and the driver. The result was an award of $105,000 to Richard Adams and $10,500 to Angela Adams. The court of appeal reversed the judgment notwithstanding the verdict and reinstated the jury's determination.[5] However, the jury verdict was amended to delete awards of medical expenses to Dr. Robert D. Voogt, a rehabilitation specialist, and Bobby Spencer Roberts, a vocational evaluation specialist, on the ground that these expenses were incurred in preparation for litigation. A writ was granted to review the judgment of the court of appeal.[6] The issues are: (1) fault of guest passenger Adams; and (2) damages.

FACTS
James Emile Mohon was driving a 1984 Datsun 300 ZX Turbo sports car that had been presented to him and his wife at their wedding six days before the accident. Although the automobile was designated as a wedding present, title to the car had remained in the name of West Esplanade Shell Service Station, Inc. d/b/a America's Largest Shell, Inc., the business owned by Mohon's father-in-law, Harlan Ray Lloyd. The business had made the down payment on the car, and the automobile was listed under Lloyd's Security Insurance Company business policy with five other vehicles. Mohon had been added to the policy's list of insured drivers. Apparently, Lloyd intended to pay the insurance and car notes[7] through his company while donating the use to his daughter and her husband. After the accident, Security paid the property damage to the automobile but disputed liability coverage. The business paid the $250 deductible. Title was transferred to the Mohons on April 20, 1985.
The Mohons had just returned from a Florida honeymoon when the accident occurred. Richard F. "Ricky" Adams, a good friend, went for a ride with Mohon in the new car. After picking up Ricky at his restaurant, Wild Bill's Southern Fried Chicken House, Mohon drove down the main street of Varnado, Louisiana, and then on to Military Highway,[8] which forms a T-intersection with Main Street. During their drive, Mohon exhibited various features of the car to Adams. After the stop at the T-intersection, Mohon accelerated. According to Mohon, he achieved a speed of about 50 miles per hour.
The car gauge could be adjusted to register either miles or kilometers. Although he was not positive, Mohon thought his speedometer was set on kilometers when Ricky Adams observed it registering 93. A speed of 93 kilometers per hour would equal only 57.66 miles per hour. According to Adams, the car did not seem to be going "that fast," i.e., 93 miles per hour.[9] Thus, the speedometer was probably registering *482 kilometers.[10] Mohon said he had slowed down to 25 miles per hour and then accelerated before he reached the curve where the accident occurred. The curve was signed for 50 miles per hour. According to Mohon's account, he was going 45 to 50 miles per hour when gravel on the road caused him to spin out of the curve backwards through a muddy clay ditch and into an impact with several trees. Adams estimated the car's speed in the curve at 60 miles per hour. The car's rear axle was broken, and the passenger's side panel was damaged. The repairs cost $10,836.06.
At trial, Adams said he did not protest about the car's speed because he did not feel endangered. In deposition, Adams had testified that he did not object because he was in shock from seeing 93 on the speedometer. The jury apparently discounted Adams' excuses because of the discrepancy in his testimony.
Dr. Glynn Hebert, Adams' family physician, treated Adams after the accident. Adams' back and right shoulder were injured. X-rays revealed fractures of the right transverse processes of L-2, L-3 and L-4 along with multiple bruises and contusions. The fractures indicated a severe blow. Adams was hospitalized for two weeks, and given conservative treatment. Dr. Hebert's diagnosis when Adams was discharged from the hospital on February 1, 1985, was: fractures with bruises and contusions of the right kidney, the liver and trunk of his body. On October 4, 1985, when Dr. Hebert last saw Adams, his prognosis was still "guarded."[11]
Adams also sustained a transverse process fracture at L-1. In addition to his fractures, Adams' soft tissue injuries, which did not show up on his X-rays, contributed to his pain and suffering. He was in a back brace for approximately nine months. In the summer of 1985, Adams developed headaches which were associated with increasing pain and spasm in his lower back. Adams attributed these problems to intense physical therapy, and discontinued the therapy. He continues to have headaches once or twice a month which are associated with pain and spasm in his cervical and low back muscles. The pain in his paraspinous muscles has improved considerably, but it is exacerbated by changes in the weather and standing or walking for a prolonged period. Although Adams continues to feel sore and stiff when he first wakes up in the morning, this generally improves with exercise and walking.
Angela Rester Adams testified about additional household expenses and stresses and strains on the marriage caused by the accident. Whereas Adams formerly jumped out of bed, he now gets up very slowly and then takes a long soaking bath.
Dr. Daniel Sterling Sinclair, a board-certified orthopedic surgeon, saw Adams on January 28, 1985, on referral from Dr. Glynn Hebert. According to Dr. Sinclair, Adams' fractures were comminuted, fragmented and displaced: only the fracture at L-1 was non-displaced.
On July 29, 1985 Adams had ulnar neuritis of his left arm and a fibrous mass in his left elbow area. On March 25, 1986, Dr. Sinclair removed the mass and the ulnar nerve was transplanted to correct the ulnar neuritis. The operation was beneficial, although it left a scar. In Dr. Sinclair's opinion, the elbow problem might have been a secondary result of the automobile accident which, by injuring the back, created a strain on the arms.[12] Dr. Sinclair said the auto accident was "the most logical explanation" of the elbow problem.[13]
In Dr. Sinclair's opinion, Adams had not reached his full potential for improvement at the time of trial, and he anticipated seeing Adams three or four more times. *483 Dr. Sinclair found Adams' persistent pattern of pain consistent with his physical findings and did not believe Adams to be a malingerer. In his opinion, Adams has a permanent physical loss of function of 10% of the body as a whole. The limitation of motion that Adams experienced is typical, the natural result of any fracture. Joint restriction is not unusual after fractures. The joints stiffen with disuse and there are some soft tissue injuries with adhesions and scarring which limit the elasticity of the tissues around the joints.
Dr. George Randolph Rice, a professor of economics at L.S.U., calculated Adams' past loss of earnings at $22,357. Adams had a life expectancy of 44.7 years, and future lost wages were estimated at $53,805.
Dr. Evan Park Howell, a neurologist, and an examiner for the American Board of Psychiatry and Neurology, testified as an expert who saw Adams over a long period of time, treating him for chronic pain. Dr. Howell prescribed Elavil, a drug used in treating chronic pain because it is analgesic, anti-depressant and non-addictive. He also recommended a TENS unit and prescribed Valium, Wygesic and Tylox. On October 1, 1985, Dr. Howell suggested that Adams receive psychological counseling and recommended Dr. William Blum, a psychiatrist. Dr. Howell last saw Adams on August 14, 1986. During the course of his treatment, Dr. Howell recommended that Adams close his restaurant business because it involved a lot of lifting. Also, because of Adams' pain, irritability and depression, Dr. Howell felt Adams did not need the additional stress of his own business. The business was closed in June of 1985.
In February of 1986, Dr. Howell began to notice an improvement in Adams' condition. Dr. Howell had strongly recommended vocational rehabilitation to Adams. In Dr. Howell's opinion, Adams has a permanent residual back disability, a chronic paraspinous muscle strain, and Adams should avoid frequent lifting of more than twenty pounds.[14] Dr. Howell thought Adams will eventually be pain-free if he avoids heavy lifting.
Dr. Howell recommended the surgery to remove the nodule in Adams' left arm and correct his ulnar nerve problem. Dr. Howell thought that the accident was the direct or indirect cause of Adams' difficulty with his elbow. It could be the result of direct trauma to the elbow in the accident or pressure on the left elbow while Adams was immobilized. It was more likely due to the confinement rather than a direct blow in the accident, but, in Dr. Howell's opinion, the problem would not have developed if the accident had not occurred.[15]
Dr. Robert D. Voogt, a rehabilitation specialist, works with disabled people to restore them to productivity. Highly qualified by education and experience, Dr. Voogt is a faculty member at the L.S.U. Medical Center in the Department of Rehabilitation Counseling and he testified as an expert in vocational rehabilitation. Dr. Voogt suggested that Adams see Dr. Gary Glynn, a psychiatrist who directs the Touro Rehabilitation Hospital in New Orleans. This recommendation was made because of Adams's difficulty in adjusting to his disability. In Dr. Voogt's opinion, Adams's physical limitations had changed his personality in a manner similar to that found in a conversion hysteria. Dr. Voogt thought a college education was essential for Adams's rehabilitation. Dr. Voogt's charges were $6,040.57.
Dr. Voogt referred Adams to Bobby Spencer Roberts, a certified vocational evaluation specialist in the field of rehabilitation who administered a variety of tests to Adams. Adams was observed to be in pain throughout the evaluation, having a lot of trouble sitting and standing. Because Adams was having trouble coping *484 with his physical problems and was taking high-level pain killers, Roberts thought Adams needed continued medical supervision and psychological counseling. In Roberts' opinion Adams will be restricted to light work because of the possibility of re-injuring his back, and Roberts recommended that Adams return to school and attempt to obtain a college degree. In Roberts' opinion, Adams' academic failure at the age of 18 would not prevent him from succeeding in college, since his test results indicated that he had the capability. Roberts' charges for his evaluation were $506.25.
Dr. Howell had suggested a psychiatric evaluation by Dr. William Blum because of the emotional and behavioral changes that Adams had experienced following the accident. After Adams was evaluated by Dr. Blum and diagnosed as having post-traumatic stress syndrome, he was referred to Dr. James P. Morgan, Jr. Dr. Morgan is a clinical psychologist and a colleague of Dr. Blum. Morgan saw Adams twenty-three times, giving him techniques for coping with his pain, losses from the accident, and loss of self esteem. In Dr. Morgan's opinion, Adams post-traumatic stress syndrome was a direct result of the accident and Adams definitely was not a malingerer. Dr. Morgan said Adams needed at least twenty-five additional visits.
Dr. William Albert Martin, a neurologist and a former associate professor of neurology at Tulane Medical School, testified that he examined Richard Adams at the request of the defense attorney. Adams was being treated with a TENS unit, Valium, Tylox and Tylenol # 3 for spasms in his back, exacerbation of the aching pain in his paraspinous muscles and intermittent pain in the right buttock radiating down to the right knee after walking or standing for a prolonged period. When Martin examined Adams, the patient walked with a stiff gait. Dr. Martin took Adams' history for half an hour to forty-five minutes and examined him for fifteen to twenty minutes. In his opinion, the ulnar nerve problem was not a direct result of the accident, but may have been caused by physical therapy which was aggressive enough to produce headaches.
Dr. James Thomas Williams, board-certified chief of orthopedic surgery at Touro Infirmary and an associate professor at Tulane Medical School, saw Adams on July 14, 1986. Adams was complaining of pain and stiffness in his neck, which was aggravated by motion. He also had persistent pain in the lower back, which was exacerbated by activity and made him unable to bend or lift, as well as occasional pain in his right buttock and right thigh and radiating pain into his right leg below the knee. Williams' examination revealed some restriction of motion in the neck, some restriction on extension of both elbows and some restriction of motion in the back. X-rays of the lumbar spine showed a slight irregularity involving the transverse processes of the second, third and fourth lumbar vertebrae on the right side, which Williams thought represented healed fractures of the vertebrae. The only abnormal finding was the stiffness in Adams' range of motion. Physical therapy was recommended. In Dr. Williams' opinion, there should be no residual disability after therapy. Dr. Williams' examination took approximately thirty minutes and he evaluated Adams solely for purposes of trial.
According to their bookkeeper, the Adams' restaurant business grossed $71,045 in 1984. The gross sales had increased from $65,071.84 in 1981 and $62,810.34 in 1982. The net profit in 1984 was either $12,170.00 or $13,808.00. Adams' father-in-law had provided $25,000 to start the business, the building housing the business and $15,000 in additional capital. The loans had been repaid in three years.

LAW AND CONCLUSION
The jury was charged in special charge number 2 that:
"A passenger in an automobile does not have to supervise the driver of the car. However, the passenger has a legal duty to protest or to try to stop a driver from acting in an obviously negligent manner."[16]
*485 The cases cited by defendant in support of special charge number 2 were: Williams v. Harvey, 328 So.2d 901 (La. App. 4 Cir.1976); Badeaux v. Patterson Truck Line, Inc., 247 So.2d 875 (La.App. 3 Cir.1971); writ den., 259 La. 77, 249 So.2d 209; Smith v. Marquette Casualty Company, 247 La. 1054, 176 So.2d 133 (1965); and Durham v. Paciera, 164 So.2d 188 (La.App. 1 Cir.1964). In Badeaux, Williams and Smith, the guest passenger or passengers were found free from negligence. Durham involved voluntary participation in a drag race and a subsequent police chase with testimony that passenger Durham called the countdown for the race. Durham had assumed the risk of being a drag race passenger. None of these cases stand for the proposition that an ordinary passenger has a legal duty to protest about a driver's negligence, although some contain dicta to that effect.
In the case relied on by the court of appeal, Duhe v. Cali, 236 So.2d 292 (La. App. 4 Cir.1970), a guest passenger on a motorcycle was found guilty of contributory negligence for not warning the driver that his speed of 60 miles per hour in a 40 mile zone was excessive. However, the passenger had been involved in 20 to 30 prior accidents resulting from the driver's excessive speed. Under those unusual circumstances, the passenger had assumed the risk of being driven at a high speed. No analogy can be drawn between the Duhe passenger and Adams.
Louisiana's case law has consistently held that a driver's negligence is not imputed to a guest passenger. Jagers v. Royal Indemnity Company, 276 So.2d 309 (La. 1973); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Felt v. Price, 240 La. 966, 126 So.2d 330 (1961); White v. State Farm Mut. Auto. Ins. Co., 222 La. 994, 64 So.2d 245 (1953); Kientz v. Charles Dennery, Inc., 209 La. 144, 24 So.2d 292 (1945); Squyres v. Baldwin, 191 La. 249, 185 So. 14 (1938); Lawrason v. Richard, 172 La. 696, 135 So. 29 (1931); Churchill v. Texas & Pac. Ry. Co., 151 La. 726, 92 So. 314 (1922); Daull v. New Orleans Ry. & Light Co., 147 La. 1012, 86 So. 477 (1920); Maritzky v. Shreveport Rys. Co., 144 La. 692, 81 So. 253 (1919); and Peterson v. New Orleans Ry. & Light Co., 142 La. 835, 77 So. 647 (1918). This jurisprudential rule recognizes the fact that an automobile passenger is generally incapable of influencing the driver's behavior:[17] "it is unrealistic to hold ... that the occupant of a motor vehicle has factually any control or right of control over the driving of the operator."[18]
A guest in an automobile has no duty to supervise the driver. White v. State Farm Mut. Auto. Ins. Co., 222 La. 994, 64 So.2d 245, 42 A.L.R.2d 338 (1953). Although some cases state that a passenger has a duty to protest excessive speed, there are virtually no cases holding that the duty has been breached. Cormier v. Royal Indemnity Insurance Company, 279 So.2d 253 (La.App. 3 Cir.1973), said there was a failure to protest but it involved a passenger who knowingly assumed the risk of riding with an intoxicated driver.[19]
Durham, Duhe and Cormier all involved voluntary assumptions of known risks. Only in such unusual circumstances have passengers been found guilty of contributory negligence for a failure to protest. In the ordinary situation, a passenger is at the mercy of his driver.
Requiring a guest passenger to protest a driver's negligence to be free from comparative fault is unrealistic. Such a protest could serve as a goad instead of a deterrent.[20] *486 Unless there are special circumstances which indicate that a passenger's protests might have influenced a driver to operate more prudently, a passenger has no duty to comment on the operation of an automobile. Furthermore, failure of Adams to protest cannot fairly be described as a cause in fact of the accident. The conflicting statements of Adams are the typical result of hindsight moralizing about what a passenger should have said or done.
Unless there is a joint venture, a negligent act by a passenger or some other independent basis for liability, such as riding with an obviously impaired driver, a passenger is entitled to entrust his safety to the driver. Gaspard v. LeMaire, supra. Even in the case of a passenger-owner, the negligence of a driver should not be imputed to a passenger to defeat or diminish the passenger's recovery against the driver. See Parrish v. Walsh, 69 Ohio St.2d 11, 429 N.E.2d 1176, 21 A.L.R.4th 454 (1982) and the authorities cited therein.
The incorrect jury charge about the duty of a passenger to protest caused the jury to find passenger Adams thirty percent at fault. The erroneous charge and its result are clearly wrong. The assessment of thirty percent fault to Adams is therefore reversed.
Since Dr. Howell, a treating physician, recommended vocational counseling for Adams, the court of appeal erred in disallowing Roberts' fee of $506.25 and Dr. Voogt's fee of $6,040.57. The jury correctly allowed recovery of these expenses.
A trial judge can grant a judgment notwithstanding a jury's verdict only when the facts and inferences are so strongly and overwhelmingly in favor of one party that the trial judge believes reasonable men could not have arrived at a contrary verdict. In other words, a trial judge can grant a judgment N.O.V. when a jury's verdict is one which reasonable people could not have rendered. Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270 (La.1986).
Reasonable people could differ about the awards for past and future pain and suffering, loss of consortium, permanent disability, and future loss of wages or earning capacity. The trial judge incorrectly substituted his judgment for that of the jury in granting the judgment notwithstanding the verdict.
The judgment of the court of appeal is affirmed insofar as it reinstated the jury's verdicts for past and future pain and suffering, loss of consortium, permanent disability and future loss of wages or earning capacity. The judgment of the court of appeal on damages is affirmed.
The judgment of the court of appeal is reversed insofar as it deleted the awards of medical expenses to Dr. Voogt and Roberts and the judgment of the trial court is reinstated.
The judgment of the court of appeal is also reversed insofar as it affirmed the determination that Adams was guilty of thirty percent comparative fault.
All costs of the proceedings below and in this court are assessed against defendants, Security Insurance Company of Hartford and James E. Mohon.
AFFIRMED IN PART AND REVERSED IN PART.
COLE, J., concurs in part; dissents in part; and assigns reasons.
COLE, Justice, concurring in part; dissenting in part.
I agree the assessment of thirty percent fault to Adams is properly reversed. I believe, however, the trial court properly increased the awards to $150,000 and $15,000. The evidence supports fully those amounts. Considering the comminuted, fragmented and displaced fractures, a permanent physical loss of function of 10% of the body as a whole, and other injuries and residuals both mental and physical, reasonable *487 men could not have arrived at a contrary result.
NOTES
[1] Prior to trial, plaintiffs settled their claim against the State of Louisiana through the Department of Transportation and Development for $2,000.
[2] Defense counsel had argued that Adams was twenty percent at fault.
[3] LSA-C.C.P. art. 1811.
[4] "Past Pain and Suffering, both physical and mental is increased from $10,000.00 to $50,000.00

Future Pain and Suffering, both physical and mental is increased from $5,000.00 to $15,000.00
Future Loss of Wages or Earning Capacity is increased from $4,000.00 to $15,000.00
Permanent Disability is increased from $3,000.00 to $20,000.00
Loss of Consortium is increased from $5,000.00 to $15,000.00."
[5] Adams v. Security Ins. Co. of Hartford, 533 So.2d 140 (La.App. 1 Cir.1988).
[6] 535 So.2d 733 (La.1989).
[7] The car was mortgaged to Nissan Motors Acceptance Corporation.
[8] It is also referred to as Highway 1071 and Old Columbia Highway.
[9] Tr. 605.
[10] This is consistent with the history given to Dr. Howell by Adams: driver Mohon tried to negotiate a curve doing in excess of 55 miles per hour. Tr. 1172.
[11] Tr. 943.
[12] The court of appeal opinion erroneously states that Dr. Sinclair said the accident did not cause the elbow problem. 533 So.2d at 148. However, this was the opinion of Drs. Williams and Martin, who evaluated Adams for defendants.
[13] Tr. 896.
[14] The court of appeal opinion erroneously states: "Dr. Howell ... found that Adams was not disabled." 533 So.2d at 148.
[15] The court of appeal erred in its evaluation of Dr. Howell's testimony, incorrectly stating:

"Dr. Howell testified that plaintiff's ulnar nerve problem was not due to the car accident." 533 So.2d at 148.
[16] Tr. 1695.
[17] Exceptions were made in Lorance v. Smith, 173 La. 883, 138 So. 871 (1931) and Aaron v. Martin, 188 La. 371, 177 So. 242 (1937). Lorance involved independent negligence by the passengers, who had crowded four persons into a two-person car. Aaron also found independent negligence on the part of a passenger.
[18] Gaspard v. LeMaire, supra, 158 So.2d at 154.
[19] In Ferguson v. Highway Insurance Underwriters, 109 So.2d 289 (La.App. 1 Cir.1959), the three guest passengers did protest about the driver's excessive speed and were found not guilty of contributory negligence.
[20] See, for example, Rogers v. Merritt, 307 Mich. 459, 12 N.W.2d 422 (1943) and Sorenson v. Wegert, 301 Mich. 497, 3 N.W.2d 857 (1942).