564 So.2d 697 (1990)
TRANS GLOBAL ALLOY LIMITED, John D. Wyatt and F. Paul Naquin, Jr., Debtors-in-Possession,
v.
FIRST NATIONAL BANK OF JEFFERSON PARISH, Allied Bank of Texas, and John R. Spratt.
No. 89-CA-736.
Court of Appeal of Louisiana, Fifth Circuit.
June 8, 1990.
Rehearing Denied July 17, 1990.
*698 Edward F. Kohnke, IV, James H. Brown, Jr., Walter F. Marcus, III, Lemle & Keller, New Orleans, for plaintiffs/appellants.
Donald A. Meyer, Kenneth S. Ardoyno, Shushan, Meyer, Jackson, McPherson & Herzog, New Orleans, for defendant/appellee, First Nat. Bank of Jefferson Parish.
Before CHEHARDY, GAUDIN, and WICKER, JJ.
WICKER, Judge.
This appeal arises from a suit for breach of contract, breach of fiduciary duty, and wrongful misrepresentation, in which a jury found the defendant bank liable and awarded damages not only to the plaintiff corporation, but also to the individual plaintiffs, who were officers and shareholders of the corporation. Subsequently the trial judge granted the defendant's motion for judgment notwithstanding the verdict, reducing the corporation's damages from $1,079,642 to $500,000 and vacating the awards to the individual plaintiffs. The plaintiffs have appealed and the defendant has answered the appeal.

PROCEEDINGS IN THE TRIAL COURT
The suit was filed on December 10, 1985, by Trans Global Alloy Limited (TGA), John D. Wyatt, and F. Paul Naquin Jr. against First National Bank of Jefferson Parish (FNJ), Allied Bank of Texas (ABT) and John R. Spratt.
The gravamen of the complaint was that FNJ violated its fiduciary obligations to and agreement with TGA, and to Wyatt and Naquin as TGA's owners, by failing to provide agreed-upon financing necessary for TGA to perform contracts to import oilfield equipment from a Chinese manufacturer for resale to a Louisiana customer, which would have resulted in a profit to TGA of over one million dollars.
Spratt was made defendant because he was the loan officer who handled TGA's transactions. ABT was made defendant because it was the correspondent bank through which FNJ handled issuance of the international letters of credit that were the medium of the financing arrangements. Both Spratt and ABT eventually were dismissed from the suit.
FNJ filed a third-party petition against Pel-Star Couplings, Inc. (Pel-Star), and China Corporation of Shipbuilding Industry, Wuhan Branch (CCSI), for indemnification if cast in judgment on the main demand, alleging that any breaches on its part were caused by the failure of Pel-Star and CCSI to perform services under contracts financed by FNJ.
FNJ also filed a reconventional demand, alleging the plaintiffs were liable in solido for $193,412.94, plus interest, attorney's fees and costs, for defaulting on loans. Acknowledging that the plaintiffs had filed petitions for bankruptcy, FNJ asserted it would seek to have the automatic bankruptcy stay lifted.
Pel-Star filed a motion to stay, since it also had filed a bankruptcy petition. However, the trial judge stayed only FNJ's third-party action against Pel-Star.
FNJ filed exceptions of no cause of action and no right of action, asserting that Wyatt and Naquin, as shareholders of the *699 corporation TGA, could not sue to recover damages allegedly due the corporation.
Following a week-long trial in November 1988, the jury returned a verdict in favor of the plaintiffs. They found that FNJ breached a "contractual or fiduciary obligation between it and TGA"; that the breach proximately caused damages to TGA of $1,079,642; that the breach was in bad faith; that the breach proximately caused Wyatt to take personal bankruptcy; that the damages sustained by Wyatt solely as the result of his bankruptcy were $324,000; that the breach proximately caused Naquin to take personal bankruptcy; and that the damages sustained by Naquin solely as a result of his bankruptcy were $17,000.

JUDGMENTS OF THE TRIAL COURT
Pursuant to the stipulation of the parties, the third-party demand and reconventional demand were submitted to the trial judge. On November 28, 1988, he rendered judgment on the reconventional demand in favor of FNJ against TGA, Wyatt, and Naquin in solido in the amount of $213,387.48, together with $46.29 per day commencing November 15, 1988, until paid. The judge also rendered judgment in favor of FNJ on its third-party demand against CCSI in the amount of $1,420,642, plus interest and costs.
On November 29, 1988, the judge rendered judgment in conformity with the jury verdict. He awarded judgment in favor of TGA against FNJ in the amount of $1,079,642, in favor of Wyatt against FNJ for $324,000, and in favor of Naquin against FNJ for $17,000, all with legal interest from date of judgment and with expert fees and costs taxed against FNJ.
FNJ filed several post-trial motions. First, it moved for a mistrial or for a new trial, contending that certain instructions to the jury were prejudicial. It also moved for a judgment notwithstanding the verdict (judgment N.O.V.) or for a new trial, in whole or limited solely to quantum, arguing that the jury did not understand the law regarding the plaintiffs' obligation to minimize their loss and damages due to the trial judge's refusal to reread the instructions to the jury. Further, FNJ filed a motion for remittitur, urging the jury erred as a matter of law by awarding excessive damages. Finally, it sought to amend the judgment to tax jury costs against TGA and to have each party bear its own expert witness fees.
TGA, Wyatt and Naquin filed a motion to amend the judgment, seeking prejudgment interest.
On April 18, 1989, the trial judge rendered an amended judgment, in which he granted FNJ's motion for judgment notwithstanding the verdict. He vacated the judgments in favor of Wyatt and Naquin, finding they had no right of action for breach of an obligation owed to the corporation, and concluded Wyatt and Naquin had not articulated a separate and distinct cause of action entitling them to damages. He reduced the judgment in favor of TGA against FNJ to $500,000, plus interest from November 22, 1988, with all costs and experts' fees taxed against FNJ. He also restated his ruling on the reconventional and third-party demands in accord with the prior judgment.
TGA, Wyatt and Naquin have appealed the judgment of April 18, 1989. They assert the district court erred in granting judgment N.O.V., in denying prejudgment interest, and in striking the damages awarded to Wyatt and Naquin since these were attributable to FNJ's breach. TGA, Wyatt and Naquin specifically seek a partial reversal of the trial judge's reduction of TGA's award to $500,000, of his dismissal of the claims of Wyatt and Naquin, and of his refusal to award prejudgment interest.
FNJ has filed an answer to the appeal, asserting that the law and the evidence do not support the finding in favor of TGA and/or Wyatt and/or Naquin; that the court's instructions to the jury after it had retired for its deliberations and prior to the entry of the jury's verdict were prejudicial and were in the nature of a prohibited Allen charge; and that the judgment should be reversed, amended, or a mistrial declared, except as to the portion of the *700 judgment that granted FNJ's reconventional demand.

EVIDENCE
The testimony at trial set forth the following:

John Douglas Wyatt
John Douglas Wyatt, known as Doug, testified he had been successful in the oilfield supply business for several years prior to the formation of TGA, through Oilfield Tubulars, Inc. (OTI), a company he formed in 1977 that supplied pipe to oilfield contractors.
In 1981 J. Paul Naquin, Jr., who had known Wyatt socially for a number of years, approached him about the possibility of importing seamless pipe manufactured in China. Naquin had developed contacts with Asian International, Ltd., a Baton Rouge agency representing China Corporation of Shipbuilding Industry (CCSI), the manufacturer. Naquin and Wyatt did a market survey and obtained purchase orders from potential customers worth millions of dollars. In July 1981 Wyatt and Naquin formed Trans Global Alloy Limited. Each owned 50 percent of the stock.
On July 7, 1981, a "Master Distributorship" agreement was confected between TGA and Asian International, under which Asian appointed TGA "sole importer and Master Distributor within the United States of `products' manufactured by CCSI." The agreement defines "products" as "drilling pipes, casings and oilfield drilling tubes and couplings, caps, and drill collars of all types and sizes manufactured by CCSI".
Within a week Wyatt and Naquin left for China to visit the factories. They discovered CCSI could not make seamless casing in excess of 20 feet long, although the industry required 40-foot lengths; therefore, they decided to explore the manufacture of couplings at a CCSI factory in Wuhan, China.
As a result, a letter of intent was executed between CCSI-Wuhan Branch, and TGA on July 24, 1981, under which TGA expressed its intent to enter into a contract for the purchase of in quantities of a minimum of two million pounds the first year, 2.5 million the second year, and three million pounds the third year, providing the product quality complied with standards set forth by the American Petroleum Institute. TGA was to provide to CCSI the manufacturing drawings, specifications and other information required to manufacture the couplings to meet API standards.
Through OTI, Wyatt had established a banking relationship with John Spratt, a loan officer at Jefferson Bank and Trust Company. After Spratt left Jefferson Bank in late 1978 or 1979 to work for Continental Bank, he solicited Wyatt's business and Wyatt transferred all his personal and business accounts to Continental. Continental later merged with First National Bank of Jefferson and continued operations under FNJ's name. (Accordingly, we refer to it hereafter as "C/FNJ.")
Upon returning to the United States, Wyatt made an appointment with Spratt to discuss the prospective arrangements with the Chinese. Wyatt obtained a $50,000 "working capital" loan for TGA from C/FNJ in August 1981.
On November 6, 1981, CCSI and TGA executed an agreement for the sale of casing couplings, with a term of 42 months. TGA agreed to purchase two million pounds of couplings during the first year. The contract provided that the first shipment of 200,000 would begin on the last day of May, 1982, and the second shipment would be made on the last day of June, 1982. Shipments of 200,000 pounds would be made each month thereafter until the quota was reached.
Payment for the first year of shipment was required to be by irrevocable, revolving letter of credit (L/C) available at CCSI's documentary draft at sight. The amount of the L/C was to be $180,000.00 and it was to be automatically restored to the original amount fifteen days after each shipment. The L/C was required to reach CCSI 30 days before the contracted month of first shipment.
The contract further provided that if the L/C did not reach CCSI within the time *701 stipulated in the contract, or if there were discrepancies between the terms of the contract and the terms of the L/C, or if TGA failed to make payment according to the conditions of the contract, then CCSI would be granted a cancellation of the contract without penalty to CCSI, plus TGA would be required to pay to CCSI certain stipulated amounts to cover CCSI's expenses and losses.
Wyatt testified that the term of the contract was to be for ten months and CCSI was to ship one-tenth of the quantity per month over ten consecutive months. TGA was to put up an L/C for the first shipment of approximately $190,000 dollars. CCSI would make the shipment, draw on the documents, and then the L/C would revolve into the next month and would keep revolving through all ten shipments. Wyatt said the total amount of the revolving L/C was "a little over one point nine million dollars."
When Wyatt and Naquin returned from China with the agreement, Wyatt met with Spratt at C/FNJ to discuss the contract to purchase the couplings. Spratt told Wyatt and Naquin to obtain a purchase agreement for the couplings along with a revolving L/C from the purchaser. C/FNJ in turn would use the purchaser's L/C as collateral to issue a revolving L/C to CCSI. Wyatt asked Spratt whether he was certain his bank would agree to issuing the revolving L/C; otherwise, Wyatt would go to another bank. Spratt assured Wyatt the letter and financing would be provided.
On January 7, 1982, TGA executed a purchase agreement with Pel-Star Couplings, Inc., under which Pel-Star agreed to purchase, for the price of $3,042,000, the two million pounds of couplings TGA was to import from China during the first year. The Pel-Star agreement provided for ten consecutive months of shipments for a total of two million pounds.
Under its contract with TGA, Pel-Star was required to deposit with TGA, on or before February 15, 1982, an unconditional irrevocable L/C in the amount of $3,042,000 in favor of TGA. The delivery of the couplings was to commence on or about June 30, 1982, and was to continue for nine successive months thereafter. Approximately ten per cent of the couplings, or 200,000 pounds, was to be delivered each month. The L/C was to allow for payment drafts to be made as delivery was completed, based on a price computed by a formula stated in the contract.
Thus, Pel-Star was to pay approximately $305,000 for each of the 10 shipments. The first five shipmentsthe first million poundswas to be blank or non-threaded couplings. However, the blank couplings had to meet API specifications. The first three shipments were to be tested at TGA's expense to determine conformity with API specifications.
After Spratt reviewed the CCSI and Pel-Star contracts, he agreed his bank would finance the transaction. Wyatt testified Spratt told him that when Pel-Star gave TGA the revolving L/C, C/FNJ would take that three-million-dollar L/C as collateral in order for C/FNJ to deliver its L/C to CCSI.
As required by C/FNJ, Pel-Star gave TGA a revolving L/C from its bank, First National Bank of Lafayette (FNBL), which was assigned to C/FNJ as collateral.
FNBL's revolving L/C, in favor of TGA for the account of Pel-Star, bore a face amount of $305,000 and was renewable to its original amount to cover nine consecutive shipments for nine consecutive months after the first shipment. Thus, the total value of the FNBL L/C was $3,050,000. Under its terms, the L/C could be drawn on for the first shipment only upon receipt of a draft and documents stating that the goods had been placed on-ship and were being shipped.
The FNBL L/C provided the expiration date of this first L/C would be June 9, 1982. If the seller was unable to negotiate the L/C before the expiration date due to late receipt of the shipment, the L/C automatically would be extended for an additional 15 days (until June 24, 1982).
An initial shipment of samples of the couplings was delivered to Pel-Star for metallurgical testing. Pel-Star advised TGA it could not sell the first month's *702 couplings because of deficiencies. Pel-Star and TGA agreed to split the loss on that shipment and C/FNJ was repaid the money it had advanced. Pel-Star and TGA entered into a second agreement on March 9, 1982, under which they were to share equally in the loss or profit from the sale of blank couplings.
Wyatt testified that, prior to issuance of C/FNJ's first L/C, Spratt told him the bank would require additional collateral for the second through tenth shipments. C/FNJ issued the first L/C around April 1. The first full shipment of couplings left China in late May. In early May Wyatt advised Spratt it was time to prepare the second L/C, at which time he was asked to execute the mortgage on his home. C/FNJ was given a corporate guaranty by OTI, personal guaranties by Wyatt and Naquin, a second mortgage on Wyatt's home, and the bank was made the beneficiary of a $500,000 insurance policy on Wyatt's life.
At the time, Wyatt said, OTI's inventory was worth approximately $400,000; his own equity in his home was approximately $75,000; his net worth for the purpose of the continuing guaranty was "approximately a half a million dollars." Considering the three-million-dollar L/C, he estimated the total value of the collateral was from 4.5 to 5 million dollars, to secure a loan for $1.9 million.
Wyatt was aware that FNJ's decision to issue a revolving L/C in the amount requested did not rest solely on Spratt, but was to be determined by the bank's loan committee. Wyatt learned in early April that C/FNJ would not issue a revolving L/C. Instead, Spratt told him, the bank would agree to issue ten consecutive monthly L/C's instead, which Spratt told him would have the same effect as a revolving L/C. However, Spratt did not tell him he would have to file a new application each time.
He informed Spratt the second shipment of couplings were required to arrive by July 24. Spratt then told him the bank would not issue a second L/C until the first shipment arrived, at which time the bank would review the credit.
During May Naquin and Wyatt were in "constant contact" with Spratt to issue the second L/C to CCSI. Spratt became very hard to get hold of. Finally they visited the bank and confronted Spratt, who then informed them C/FNJ had decided it would not issue the second L/C until it had received payment on the first L/C, at which time TGA's credit would be reviewed and, if approved, the second L/C to the Chinese would be issued. Wyatt stated he and Naquin were shocked at the change of commitment on the bank's part.
Had Spratt told him originally that no second L/C would be issued until 60 or 90 days after the first, Wyatt stated, he would have requested the return of his L/C in order to go to another bank.
On cross-examination Wyatt stated Spratt was asked daily, beginning in May, to issue the second L/C. Although the bank originally made a commitment to issue the letter in early May, Wyatt admitted he knew by late May that the bank had reneged on its commitment. He stated he did not seek financing from another bank when he learned of the change because FNJ had all his collateral, but he admitted that he never asked FNJ to transfer the collateral to another bank.
The deadline to meet the requirements regarding documentation of the first shipment was June 24, 1982. The necessary documents were received and were presented to FNBL on June 24, 1982. FNBL paid in excess of $290,000 for the couplings shipped directly to C/FNJ, as assignee, which paid the balance to TGA.
The first shipment arrived on July 17, 1982. A one-percent sample was sent to AMF Tuboscope, which certified the couplings on July 19, 1982.
Under the terms of the FNBL L/C, shipment two had to be in the United States by July 24, 1982. If no record payment was made the L/C would expire. In order to get CCSI to make the second shipment, C/FNJ had to send TGA's second letter of credit to CCSI in the amount of $190,000.
C/FNJ's second L/C was not issued until July 21, 1982. This left only three days for *703 the goods to be shipped to the United States. However, Wyatt stated, the officers at C/FNJ told him the Lafayette L/C would be enforceable.
On or about September 17, 1982, the second shipment arrived in Houston. Wyatt drew samples and had these inspected. The necessary documentation first went to ABT from China. Then the documents went from ABT to C/FNJ. After the documents were in order, Wyatt drove, along with a C/FNJ officer named Lathrop and others, to FNBL in Lafayette on September 28, 1982, to present a draft on the L/C. FNBL refused to pay, on the ground their L/C had expired when the goods failed to reach the United States by July 24, 1982.
Thereafter C/FNJ and TGA filed suit against FNBL to enforce the L/C. The Lafayette court ruled on December 27, 1984, that the L/C had expired in July 1982. Trans-Global Alloy Ltd. and First National Bank of Jefferson Parish v. First National Bank of Lafayette, No. 825648, Fifteenth Judicial District Court. That judgment was affirmed on appeal. Trans-Global Alloy, Ltd. v. First Nat. Bank, 490 So.2d 769 (La.App. 3 Cir.1986).
After the L/C expired, C/FNJ refused to extend further credit to TGA, forcing Wyatt and Naquin to obtain additional financing from another source. At the time C/FNJ refused to issue the second L/C, CCSI was contacting TGA on an almost-daily basis inquiring about the L/C. Since C/FNJ was delaying the letter for the second shipment, TGA was trying to delay CCSI on shipments three and four. By June 18, 1982, TGA was threatening to cancel its contract with CCSI as a delaying tactic, because of pressure from CCSI for the second L/C.
Wyatt testified he was told by Spratt in late May or early June 1982 that the bank was reneging on its commitment. However, he stated, the first time the bank said it would issue the second L/C only after the first shipment had arrived and been paid for was around June 24, 1982.
The first letter was issued April 12, 1982, and the second on July 21, 1982. Payment arrived on the first shipment June 24, 1982. The amount to be paid on the second was $190,000. According to Wyatt, the bank did not even keep its agreement to issue the second L/C upon payment of the first, since they waited almost a month before doing so.
The first five shipments were supposed to be blank couplings. The subsequent shipments were to be threaded couplings. The only means for TGA to pay for additional shipments was the L/C from the Lafayette bank, which had expired.
After C/FNJ refused to extend further credit, TGA went to a third party named Jules Leblanc, who arranged financing through Louisiana National Bank (LNB), a Baton Rouge bank. On June 13, 1983, TGA executed an amended contract with CCSI, pursuant to the new loan arrangements.
Their business venture was unsuccessful, however. LNB became dissatisfied because TGA was not selling the inventory as quickly as the bank wanted to reduce the principal and to pay the interest. Leblanc bought the loan from the bank and TGA became indebted to him for $500,000.
TGA was placed into bankruptcy by its creditors in December 1984, although C/FNJ was not one of the parties who filed for the involuntary bankruptcy. In December 1985 TGA filed the present suit against C/FNJ.
Wyatt admitted the oil market collapsed in 1982-1983 and that it was not only TGA that had a problem. After TGA ceased operations in 1984 Wyatt and Naquin formed Trans Global Tool (TGT) for the purpose of importing hand tools from China. The venture was not profitable, however.

J. Paul Naquin, Jr.
Naquin testified his testimony was substantially the same as Wyatt's testimony. Wyatt had handled most of the bank negotiations, but Naquin did attend several meetings with Spratt. At first Spratt told them there would be no problem with FNJ's loan committee giving TGA what it needed. Later Spratt advised them that, *704 although the bank would not issue a revolving L/C, it would issue an L/C "constructed and issued to conform to the terms by which [TGA] would have to perform to deliver goods to FNBL to draw on [the Pel-Star] letter of credit." Naquin's understanding was that C/FNJ would issue ten consecutive L/Cs.
Wyatt and Naquin started asking in early May for the second L/C. Naquin learned from Wyatt that it was going to take a few days extra because the bank wanted additional collateral. He could not recall clearly when he first learned that C/FNJ had decided to delay issuance of the second L/C until the arrival of the first shipment. Although it could have been as early as the first week of April, he felt that he had not learned this until late May.
They did not seek other financing because Spratt assured them C/FNJ would draw on the FNBL L/C. They never discussed with Spratt the possibility of moving their collateral to get a loan from another bank because they were looking to FNBL for their money. They were "taking the word of [their] banker * * * that's what we went to him for."
He admitted that following the collapse of their arrangements with C/FNJ and FNBL, TGA eventually found alternative means of financing through private individuals. Counsel stipulated that an act of dation subsequently was executed, whereby FNJ released TGA's indebtedness of $336,000 in return for title to its coupling inventory.

John Spratt
Spratt was senior vice-president both at Continental Bank and, after the merger in 1982, at FNJ, where he worked until June 1985.
He stated Wyatt approached him in 1981 to discuss financing for the purchase of couplings from China. Spratt submitted a loan application on behalf of Wyatt and TGA to the loan committee, which in August 1981 approved a working capital loan in the amount of $50,000. It was understood the bank would be asked to extend credit in the form of an L/C.
In January 1982 Spratt wrote to James Little, vice-president of Allied Bank of Texas (ABT), regarding issuance of the L/C, with copies of the TGA/CCSI and TGA/Pel-Star contracts. Because C/FNJ had no international department, it used other banks when an international L/C was required. He had consulted Little on prior occasions for advice regarding international L/Cs. Any such L/C would be issued jointly by C/FNJ and by ABT as its corresponding or "upstream" bank, a regular practice.
Spratt had access to all the documents regarding the transaction. TGA was to purchase the couplings from CCSI for approximately 1.9 million dollars and Pel-Star would buy the couplings from TGA for three million fifty thousand dollars, which was to be backed by a letter of credit. Spratt understood that TGA was required to furnish an irrevocable L/C to the Chinese and that Pel-Star also was required to supply an irrevocable L/C.
Little of ABT wrote back to Spratt on January 25, 1982, advising a 60-day renewal date for the L/C rather than the 15-day period to which the contract with the Chinese referred. Little indicated that, because an L/C is a "separate and unique instrument" from a sales contract, banks using an L/C "should in no way be concerned with or bound by such a contract." Little was against issuance of a revolving L/C; instead, he favored separate L/Cs, issued one at a time.
Despite ABT's position that the L/C was not required to be issued in accord with the contract terms, Spratt admitted, he knew the L/C must comply with the contractual obligations for TGA to perform under the contract. At a February 1982 meeting with the Chinese attended by Spratt, Don Weekly (Spratt's superior at C/FNJ), and the TGA principals, Spratt and Weekly still thought they could structure L/Cs to the satisfaction of the Chinese and TGA. Spratt still thought a revolving L/C could be issued.
TGA obtained a revolving L/C from FNBL in the amount of $305,000 for 10 consecutive timesa total of $3,050,000 *705 which TGA assigned to C/FNJ as collateral. Despite this, however, when the loan committee reviewed the application in March 1982, their consensus was that they did not want to make a long-term commitment by issuing a revolving L/C, but they would approve issuing a $190,000 L/C secured by additional collateral. Then, if the first shipment went smoothlyif C/FNJ received payment on the first L/C without complicationsthe bank would issue subsequent L/Cs. The loan committee also wanted additional collateral.
The first L/C was issued by ABT on April 9, 1982. A collateral mortgage on Wyatt's home was executed May 13, 1982, to secure the funds to be advanced on the L/C.
Spratt stated he told Wyatt and Naquin "quite a few times after that loan committee" meeting that the bank would not issue simultaneous L/Cs, that the maximum exposure the bank wanted was $190,000 and the bank wanted to make sure there was performance. He admitted the FNBL L/C made no such requirement. He stated it was their opinion that the FNBL L/C "did not have cash value of three million dollars," despite that L/C's language stating that it was "absolutely irrevocable and unconditional except as set forth herein" (the latter phrase referring to documentation of the shipment and compliance with inspection and certification requirements).
Spratt admitted he knew the terms of the contracts. However, he told Wyatt in April that the bank intended to wait until the goods arrived before it issued the second L/C. He stated Wyatt and Naquin could have gone to another financial institution if they were dissatisfied.
Spratt stated that, at the time, it was his opinion the FNBL L/C would expire at the end of the 10 shipments because it was revolving. He knew each month had to be shipped consecutively, with the second shipment due one month after the first, and that the first one started on presentation of the documents. He thought, however, the letter would not expire until 1983.
FNJ received payment on the first L/C on June 24, 1982. Although C/FNJ's condition was only that it get paid on the first L/C before it issued the second L/C, Spratt admitted C/FNJ still waited until July 21, 1982, to issue the second L/C.
Spratt indicated the further delay arose because Pel-Star and TGA were having problems at that time: the market was declining and, in June, Naquin and Wyatt informed him that Pel-Star was trying to renegotiate the contract. Mr. Ory, an officer of FNBL, informed Spratt he felt uncertain about the Pel-Star L/C. Little of ABT advised Spratt that if all the parties to the transaction were not committed the entire matter could end up in litigation; he recommended only they issue one L/C at a time. Spratt agreed, however, that Little had told him the FNBL revolving L/C would be enforceable as long as its conditions were met.
Spratt testified it was the bank's opinion, based on the advice of four law firms it had retained, that the FNBL L/C had not expired. If C/FNJ had not thought the FNBL L/C was still outstanding, he stated, they would not have issued the second L/C because the FNBL L/C was its source of repayment. In Spratt's earlier deposition, however, he had stated that once the bank had collected its money "[t]here was no need to worry about that collateral any longer."

Don Weekly
Weekly had been senior executive vice president and a director of the board at Continental Bank. When Continental merged with FNJ, his title was changed to first vice president, the number-two man in the bank under the president. He was with C/FNJ from 1979 to September 1983 and served on all the bank's loan committees.
In the fall of 1981 the loan committee approved a loan to TGA of $50,000 to help the company get started. In February or March 1982, at John Spratt's invitation, Weekly attended a meeting in Baton Rouge with Naquin, Wyatt, and two members of the Chinese trade delegation. Weekly speaks and understands some Chinese. He stated the purpose of the meeting was to *706 prove to the Chinese that TGA had a bank connection capable of providing TGA's financial needs and to discuss the Chinese requirements regarding the funding of TGA's commitments.
He stated the Chinese made it very clear that they had to have a commitment: "The intended commitment was to have a credit facility evidenced by letters of credit or by a letter of credit which had an aggregate total of a million nine hundred thousand dollars." The total was to be paid in consecutive installments to the Chinese.
He stated he knew, and certainly Spratt knew, that the letters of credit had to be issued "back to back" or "the Chinese would not play." He agreed it was his bank's intention to provide a financing commitment to enable TGA to perform under that contract on all ten shipments, through the issuance of back-to-back letters of credit of $190,000. He admitted that commitment "apparently was not" kept because the Lafayette letter of credit "was allowed to expire," although FNJ held it as collateral at the time it expired.
He admitted the three-million-dollar letter of credit from the Lafayette bank was known by the loan committee to be the primary method of repayment of FNJ's letters of credit and this was reflected on the internal loan application form presented to the officer's loan committeea form the customer does not see that is prepared by bank employeeswhich bore the penciled notation, "L.C. will expire on 6/9/82." He stated that banks maintain a "tickler" system on documentary collateral to prevent it from expiring.
After the meeting in Baton Rouge, Weekly felt FNJ should issue the revolving letter of credit because he felt it was a "credit-worthy deal." The loan application was approved some time between March 25 and April 2, 1982. At the time Weekly sent the following memo to Spratt: "Attached is a commercial loan application that was subsequently approved in our conversations. Please notice that I penciled in that this letter of credit will not be a revolver and will expire June 9, 1982, and that further collateral is the demand collateral mortgage, second position, on Mr. Wyatt's personal residence."
This eliminated the revolving aspect of the letter of credit, despite what Weekly admitted was contradictory language in the loan application. Weekly also admitted that when he and Spratt met with the Chinese in Baton Rouge, part of the purpose of the meeting was to convince the Chinese that FNJ could issue a revolving letter of credit.
At the time it was FNJ's policy to consult with Allied Bank of Texas regarding issuance of international letters of credit, because ABT had a big international department and FNJ had no international department. Spratt contacted Mr. Little of ABT for advice regarding issuance of the letter of credit as requested by TGA. Little opposed issuance of a revolving letter of credit.
As a result, Weekly said, "our little bank" had a problem with issuing "a letter of credit of this amount that was to last for this period to time." Several members of the loan committee wanted additional collateral, because they were "uncomfortable with [FNJ's] credit facility," although no one said anything derogatory about the structure of the letter from the Lafayette bank. Ultimately the loan committee decided to require additional collateral from TGA. Although the memo subsequently issued mentioned nine additional letters of credit, Weekly said, it did not commit to issue them.
Weekly stated that he and Spratt "wanted these people to get a million nine hundred thousand in a credit facility." He affirmed this was to be achieved by issuing consecutive monthly letters of credit that would be issued singly each month rather than revolving.
Weekly pointed out further discrepancies. The loan application, as approved by the loan committee, bore the handwritten amendment stating that the L/C would expire June 9, 1982, yet the expiration date of the hand note that had been provided as collateral for the L/C was shown as February 1983. He stated, "There would be no reason to have a hand note expire [on] a *707 date different from the letter of credit date." Weekly interpreted this as a commitment on the bank's part to issue letters of credit over ten consecutive months.
In addition, the application, as approved, still bore mention of nine future shipments to be "drafted on." No one on the loan committee struck that out. Further, a draft on the Lafayette L/C by FNJ dated September 28, 1982, bore a typewritten notation "Number one of nine consecutive draws."
Weekly did not recall ever speaking with Naquin or Wyatt thereafter regarding the matter, nor did he recall receiving any correspondence of complaint from TGA directed to him. He said it would have been unusual for him to have received communications from them because he was not their loan officer.
Weekly admitted that he had a financial interest in the bank because he held stock in the bank's holding company. He also admitted he had been indicted by a federal grand jury and had been sentenced to 90 days in federal prison as a result of an Internal Revenue Service investigation of a customer of the bank who also was a member of the board of directors. Weekly was asked to leave the bank in May 1983 as a result of that investigation. He stated he held no malice against anyone connected with FNJ as a result of the incident and that he frequently referred business to the bank.

William Ory
William Ory, who was vice-president and commercial lender at First National Bank of Lafayette in March 1981, testified both as a fact witness and as an expert in banking. He stated he was approached in December 1981 or January 1982 by Terry Fitzgerald, the primary owner of Pel-Star Couplings, about structuring a letter of credit.
Regarding the terms of the CCSI contract, in Ory's opinion the second shipment was due July 9, 1982, and should have arrived by July 24, 1982.
As a banking expert, he stated the Lafayette L/C was collateral and it was contrary to good banking standards for FNJ to allow that collateral to expire.

James William Little
James Little was senior vice-president and head of the international department of Allied Bank of Texas at the time of the transactions made the basis of this suit. By the time of the trial he was executive vice-president, head of the international department, and a member of the bank's senior loan committee.
He stated that when Spratt contacted him regarding the TGA transaction, he advised Spratt the 15-day revolving period was "completely unworkable" and recommended a 60-day period. He advised Spratt the bank should not consider FNBL L/C as true collateral and told Spratt ABT could not issue "back to back letters of credit." ABT did issue two L/Cs for the Chinese on behalf of C/FNJ.
He testified that Spratt was free to look to another bank for assistance and stated he did not know the type of commitment C/FNJ had made to Wyatt and Naquin.

David S. Fitzgerald
Fitzgerald testified he owned 45 percent of Pel-Star's stock at the time of the transaction. Fitzgerald stated the forging process used in China was not approved by the American Petroleum Institute. Thus, Pel-Star ran into problems because no one here would thread the blank couplings and stamp them as API-approved.
On March 9, 1982, therefore, a supplemental agreement was executed between Pel-Star and TGA so that Pel-Star would not suffer a loss. Under the agreement, the two companies would share in the profits or losses on the blank couplings. Subsequently, Fitzgerald and his partner learned that, contrary to what they had been led to believe, TGA was not the exclusive source to the Chinese couplings. The agreement was modified further to require Pel-Star to take only two shipments of blank couplings, less than the original requirement.
According to Fitzgerald, "Pel-Star went broke because of this deal." The company to whom Pel-Star was selling the couplings *708 refused to accept them because they failed to meet certain specifications. Even had the second shipment been timely, he testified, if it had been identical to the first it would not have been acceptable. He stated, "I was satisfied that this material was not to our plans and specifications." He said Pel-Star was going to refuse to accept any further shipments if identical with the first.

James Byrne
James Byrne testified as an expert in the field of banking practices and, specifically, international banking practices related to the issuance of international letters of credit. He defined a letter of credit as an undertaking by a bank, direct and independent of any other undertakings, that the bank will honor its obligation as stated in the letter of credit upon compliance with the conditions that the letter of credit contains. He stated,
"A revolving letter of credit is a way of solving one kind of a problem. The problem is where you have a series of transactions that you want to be paid by means of a letter of credit. * * * A revolving letter of credit either revolves around the idea of the amount of the letter of credit, or it revolves around a period of time."
He reviewed all the contract documents and, in his opinion, the FNBL letter of credit could not be viewed as collateral. He interpreted language in the letter to require the Lafayette bank to determine whether there had been compliance with certain specifications in the shipment of couplings, rather than a mere determination that documents were given stating the specifications had been met. Since the Lafayette bank had to make that factual determination, he did not view that letter of credit as collateral. Letters of credit must be based on documents and not upon factual determinations, he stated.
Byrne stated that, had his opinion been requested by C/FNJ from March 24 through April 2, 1982, regarding issuance of a revolving letter of credit back-to-back on the Lafayette letter, he would have said it would not be sound to do so. He classed the action taken by C/FNJ as prudent bank practiceto issue one letter of credit at a time and to issue the second only after there had been performance on the first.
He agreed that C/FNJ had a duty to safeguard any collateral it took.

William R. Legier
Legier testified as an expert in financial planning and certified public accounting. In his calculations, if TGA's contracts with CCSI and Pel-Star had been completed as scheduled and if the $3,050,000 face amount of the FNBL L/C had been collected, TGA's lost profit would have been $1,079,672.
On cross-examination, he admitted he had not taken into account either Pel-Star's August 17, 1982, letter of default on the contract or the expenses of the first trips the TGA officers took to China in 1981. Had he considered these expenses, he stated, they would have increased the amount of lost profits. He testified he calculated conservatively in arriving at his figures.
He did not know whether the costs of the trips to China taken by Naquin and/or Wyatt from November 1982 through June 1983 were included as costs or as operating expenses. The only cost he considered was TGA's cost for obtaining letters of credit; he did not include any cost or expense for buying equipment necessary to obtain API certification.
He attributed the loss to the corporation, not to the individual shareholders.

CLAIMS OF WYATT AND NAQUIN
On the last day of trial FNJ filed exceptions of no right of action and no cause of action, asserting that Wyatt and Naquin, as shareholders of the corporation TGA, could not sue to recover damages allegedly due the corporation.
Wyatt and Naquin, however, noting that TGA was a closely-held corporation whose sole shareholders were themselves, assert TGA's loss of profit was of necessity a loss to themselves personally; in addition, they were personally bound for repayment of the loan from FNJ to TGA.
*709 In his reasons for judgment, the trial judge concluded Wyatt and Naquin have no right of action and their petition set forth no allegations entitling them to damages for a cause of action separate and distinct from TGA's cause of action.
We agree. As this Court stated in Hinchman v. Oubre, 445 So.2d 1313 (La. App. 5 Cir.1984), at 1317:
If a corporation has sustained a loss then only that corporation can sue to recover it. * * * A person who conducts business in corporate form and reaps the benefits of incorporation cannot sue individually for damages incurred by the corporation. * * * [Citations omitted.]
As stated in the trial court's well-reasoned analysis, although the jury found that FNJ breached an obligation to TGA, it also found this breach caused Wyatt and Naquin's personal bankruptcies and found FNJ liable to them. This was error, because "a corporation is an individual being, separate and distinct from the individuals who compose its membership. Consequently, any debts and obligations due to a corporation are not due to the individuals who compose its membership."
Therefore, Wyatt and Naquin, as shareholders of the corporation, are not entitled to damages because they are separate legal entities from TGA, which is the only party entitled to recover.
Because the trial judge concluded neither Wyatt nor Naquin had set forth allegations that would entitle them to separate causes of action, he did not order them to amend their petition to remove the ground of the objection pleaded by the peremptory exception. It is not necessary for us to give them leave to amend, because the objection cannot be cured and therefore leave to amend would be a vain and useless act. Alexander & Alexander v. State, Div. of Admin., 486 So.2d 95 (La.1986).
Having concluded the trial court was correct in maintaining the peremptory exceptions, we pretermit Wyatt's and Naquin's specification of error regarding whether they suffered damages attributable to the breach by FNJ.

JUDGMENT NOTWITHSTANDING THE VERDICT
In granting FNJ's motion for judgment notwithstanding the verdict (judgment N.O.V.), the trial court set aside the $1,079,642 jury award in favor of TGA against FNJ and reduced the amount to $500,000, stating any award in excess of that amount would be "clearly excessive." TGA, Naquin and Wyatt argue it was error for the trial judge to reduce the award.
In his written reasons, the judge stated he made the reduction because he found the jury's damage award excessive. Pointing out that the jury awarded the exact figure calculated by TGA's expert, William Legier$1,079,642the judge stated the lost profits award was conjectural and speculative. He reduced the damages to $500,000, without explanation of how he arrived at that figure, citing La. Civ.Code art. 1999: "When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages."
The court acknowledged that a jury's quantum award should not be disturbed unless it is clearly shown that the jury abused its discretion, but stated FNJ's arguments were "persuasive":
FNJ argues that TGA's profits were greater by sending this case to the jury [than they] ever would have been had they sent the couplings to Pel-Star. FNJ further argues that Pel-Star would not have accepted any future shipments even if they had been timely delivered; that payment for shipments two (2) through ten (10) would have necessitated litigation against Pel-Star as well as the First National Bank of Lafayette. FNJ argues that the Lafayette bank's letter of credit would not have been honored as Pel-Star would have obtained a temporary restraining order even if shipments had been timely delivered and the draft against the letter of credit timely presented. FNJ further points out that Pel-Star filed bankruptcy so they would not have been able to pay the debt owed to TGA even if it were due.
*710 In Adams v. Security Ins. Co. of Hartford, 543 So.2d 480, 486 (La.1989), the Louisiana Supreme Court considered a judgment N.O.V. on the issue of quantum and held:
A trial judge can grant a judgment notwithstanding a jury's verdict only when the facts and inferences are so strongly and overwhelmingly in favor of one party that the trial judge believes reasonable men could not have arrived at a contrary verdict. In other words, a trial judge can grant a judgment N.O.V. when a jury's verdict is one which reasonable people could not have rendered. [Citation omitted.]
The Adams court cautioned against a trial judge substituting his judgment for that of the jury in granting a judgment N.O.V.
A judgment N.O.V. is based on a different standard from additur and remitteturnamely, that based on the evidence there is no genuine issue of fact. Thus, where the trial court is convinced that, under the evidence, reasonable minds could not differ as to the amount of damages, it should have the authority to grant the appropriate judgment notwithstanding the verdict. Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270 (La.1986).
The party against whom the motion for judgment N.O.V. is made must be given the benefit of every legitimate and reasonable inference that can be drawn from the evidence by the jury. Zeagler v. Dillard Dept. Stores, Inc., 521 So.2d 766 (La.App. 2 Cir.1988); Hardin v. Munchies Food Store, 510 So.2d 33 (La.App. 2 Cir.1987).
A trial court passing on a motion for a judgment N.O.V. cannot weigh the evidence, pass on the credibility of witnesses, or substitute its judgment of facts for that of the jury. Wooten v. Louisiana Power & Light Co., 477 So.2d 1142 (La. App. 1 Cir.1985).
[I]f there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied * * *.
Boeing v. Shipman, 411 F.2d 365, 374 (5th Cir.1969), quoted in Scott, supra, at 274, and in Wooten, supra, at 1144.
Under the circumstances of this case, we conclude the trial court erred in granting a judgment N.O.V. with regard to quantum.
"The trier of fact, here the jury, is given much discretion in fixing the measure of damages. LSA-C.C. art. 1999 * * *." Scott, supra, at 274.
The jury verdict based on Legier's figure is one which reasonable people could have rendered. It was the jury's province to assign credibility to the witnesses. It is apparent, from their award, that they rejected Fitzgerald's testimony that Pel-Star would not have accepted further shipments from TGA, rejected FNJ's argument that Pel-Star would have obtained a T.R.O. against further drafts on the FNBL L/C, and accepted Legier's testimony regarding the amount of TGA's lost profits.
FNJ specifies as error the award of any damages for lost profits. However, eleven jurors as well as the trial judge clearly felt such damages were proven, although the judge's assessment differed from the jury's.
The trial court correctly upheld the judgment as to FNJ's liability, because reasonable people could have rendered such a judgment. There is ample evidence to support the jury's conclusion that FNJ breached its agreement to TGA by allowing the FNBL L/C to expire.

EFFECT OF FINAL CHARGE TO JURY
FNJ contends the trial judge erred by administering a so-called "Allen charge" or "dynamite charge" to the jury for the purpose of breaking an impasse. Therefore, FNJ argues, the trial judge should have granted FNJ's motion for a mistrial, pursuant to La.C.Civ.P. art. 1793.
The term "Allen charge" arose following the decision in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), in which the U.S. Supreme Court approved use of jury instructions calculated to break *711 jury deadlocksi.e., "dynamite" them and achieve jury unanimity. Within the last few decades, however, use of such charges has been expressly disapproved and/or limited by most state and federal courts, including Louisiana: "[W]e henceforth ban the use of the `Allen charge' and of any coercive modification thereof in the courts of Louisiana." State v. Nicholson, 315 So.2d 639, 641 (La.1975).
Our Supreme Court's language in Nicholson, supra, does not limit the ban of the use of the "Allen charge" to criminal cases. Accordingly, we must agree with the defendant-appellee that such charges "and any coercive modification thereof" are impermissible in civil as well as in criminal cases tried in Louisiana courts.
The situation was as follows: After the jury retired to consider the case, a member of the jury told the courtroom bailiff they were at an impasse, had a few questions, and wanted to know whether they could get something to eat if they were going to be there much longer. The jury foreman informed the judge that the jury wanted to continue to deliberate. The judge stated,
I'm going to do this. I'm going to send you back. If you do not reach a verdict, as I say, it's now 7:30. If you have not reached a verdict by eight o'clock, then I'm going to bring you back at nine o'clock tomorrow morning and continue your deliberations. Okay?
So I'll ask you to please go back in the jury room.
After the jury again retired, defense counsel objected to this charge. The trial judge stated he had not intended it to be dynamite in nature and had given it because, in his experience, "after eight o'clock at night jurors get tired and simply don't render proper judgments and all I was telling them was ... that I'd bring them back ... in the light of a fresh new day [to] once again deliberate."
FNJ contends the judge's comments placed the jury under a court-ordered time limit and the jurors were coercively affected by that time limit, because several of the jurors had plans to go out-of-town for the Thanksgiving holidays.
We do not find these comments coercive or impermissible. The judge's remarks were entirely appropriate to the circumstances in which they were made.
"Comments by the trial judge which do not prejudice the jury against one of the parties are not improper and do not constitute ground for reversal." Britt v. Travelers Indemnity Company, 205 So.2d 880, 885-886 (La.App. 4 Cir.1968). The judge correctly concluded the comments were not prejudicial.
Further, considering that the trial judge granted a judgment N.O.V., from which both parties have appealed, the effect of the judge's comments on the jury is of no moment.

INTEREST
TGA argues the trial judge erred by awarding interest only from the date of the judgment, contending it is entitled to pre-judgment interest also. TGA seeks interest from the date of the default or, alternatively from the date of judicial demand.
The trial judge obviously concluded that damages in this case were not ascertainable until the date of judgment. We find no abuse of the trial court's discretion in making this finding. See Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978).

DECREE
For the foregoing reasons, the judgment of April 18, 1989, is affirmed insofar as it dismissed the individual claims of John Wyatt and Paul Naquin. The judgment is vacated insofar as it reduced the damages awarded to Trans Global Alloys Limited and the judgment of November 22, 1988, is reinstated insofar as it incorporated the jury's award of damages to Trans Global Alloys Limited in the amount of $1,079,642.
Costs of this appeal are assessed against First National Bank of Jefferson Parish.
*712 AFFIRMED IN PART, VACATED IN PART, AND RENDERED.