656 So.2d 728 (1995)
GARLEPIED TRANSFER, INC.
v.
GUARANTY BANK AND TRUST COMPANY.
No. 94-CA-549.
Court of Appeal of Louisiana, Fifth Circuit.
May 30, 1995.
*731 Coleman, Johnson & Artigues, Charles B. Johnson, Peggy Wallace, New Orleans, for defendant/appellant Guaranty Bank & Trust Co.
Lanny R. Zatzkis, Karen D. McCarthy, Yvette A. D'Aunoy, Law Office of Lanny R. Zatzkis, New Orleans, for plaintiffs/appellants Emile Garlepied and Garlepied Transfer, Inc.
Before DUFRESNE, GOTHARD and CANNELLA, JJ.
CANNELLA, Judge.
Defendant, Guaranty Bank and Trust Company (Guaranty), appeals from a jury verdict in favor of plaintiffs, Emile Garlepied (Garlepied) and Garlepied Transfer, Inc. (GTI), finding that Guaranty had breached a loan agreement with GTI, that Guaranty had acted unreasonably in calling due another loan to GTI and that Garlepied sustained damages of $255,000. Plaintiffs answered the appeal, seeking modification of the judgment. For the reasons which follow, we amend in part and affirm as amended.
GTI, a Louisiana trucking company, was founded in 1969. Garlepied was its sole shareholder and president. GTI was a growing concern and had, prior to 1979, obtained a Small Business Administration (SBA) loan from First Metropolitan Bank through its president, Joseph Martin. GTI did not pledge its accounts receivable to secure the SBA loan, leaving them available for future financing, if necessary. In 1979, GTI unsuccessfully sought financing for an accounts receivable line of credit from First Metropolitan but ultimately obtained financing from Guaranty through Ronald Melancon, an Assistant Vice-President. On December 27, 1979, GTI executed a promissory note in the amount of $25,000 payable to the bank. The $25,000 note was for a term of 90 days and was secured by an assignment of GTI's accounts receivable. The $25,000 loan was thereupon made by Melancon. The $25,000 note was renewed on March 26, 1980 and again on June 24, 1980. As of that date, GTI's total liability to Guaranty was $25,000. Ultimately, by September 18, 1980, Guaranty increased its loan commitment to $100,000, upon receiving additional collateral, consisting of the assignment of GTI's Louisiana Public Service Commission Certificate of Public Convenience and Necessity (operating authority)[1], a second mortgage on unimproved real estate and a $100,000 personal continuing guaranty from Garlepied.
There is a conflict in the testimony as to what transpired next. Garlepied essentially testified that he was encouraged by Melancon to expand and obtain an expanded operating authority from the Interstate Commerce Commission (ICC). Garlepied contends that Melancon was informed that the authority expansion application required evidence that funding was available for the expansion if the authority was granted. He further stated that Guaranty, through Melancon, promised him a line of credit up to $500,000 for the expansion and this information *732 was conveyed to the ICC by letter from Mr. Melancon. Based on this promise, Garlepied did apply to the ICC for the expanded authority. After GTI received the authority from the ICC, GTI spent its working capital on expansion and received commitments from some of its customers for the increase in business. Guaranty then refused to honor its loan commitment and provide the promised funding. As a result, GTI was forced to close its terminals, scaled back and eventually, went into bankruptcy.
Guaranty, on the other hand contends that Melancon only had $40,000 loan authority and could never have committed the bank to a $500,000 loan. They contend that the $500,000 loan was talked about, but no commitment was made and when the loan was formally requested in August 1981, the loan committee determined that it was a bad risk and denied it.
However, in October of 1980 Melancon did write a letter to the ICC, as part of GTI's application for the expanded trucking authority, which provided:
This is to advise your department that if an expanded authority is granted to Garlepied Transfer, Incorporated, our bank has approved the necessary financing for them to initiate their expansion.
After Guaranty refused the $500,000 loan they also called GTI's note supporting the $100,000 loan. GTI was advised that Guaranty was going to notify GTI's accounts receivable customers if the loan was not repaid by the close of business that day. GTI filed for bankruptcy.
Eventually the suit herein was filed. GTI alleged that Guaranty had made the loan commitment agreement for $500,000, upon which GTI had relied to its detriment, and that Guaranty breached that loan agreement. GTI further alleged that Guaranty acted unreasonably and breached its fiduciary duty in the manner in which it called the $100,000 loan, both of which led to GTI's ultimate bankruptcy. Finally, by amended petition, Garlepied, personally, was added as a plaintiff and alleged personal damages.
After a four day jury trial, in response to interrogatories, the jury found that Guaranty had "breached its agreement with plaintiffs to provide financing for Garlepied Transfer, Inc." and "breached its obligation and acted unreasonably in threatening to call plaintiff's accounts receivable customers and by calling the loan" which resulted in damages to plaintiffs. The jury awarded damages to Garlepied in the amount of $255,000 but awarded nothing to GTI. The court denied both parties' motions for a new trial and denied Guaranty's motion for judgment notwithstanding the verdict. All parties have appealed.
The major issue on appeal concerns the factual determinations by the jury, finding Guaranty liable in the amount of $255,000. Guaranty, of course, argues that the jury erred in finding that it had a loan agreement with GTI for over $100,000 and that it breached that agreement. Guaranty also argues that the jury erred in finding that it acted unreasonable in calling GTI's $100,000 demand note. Finally, Guaranty argues that the damage award is erroneously high. GTI argues that the jury was correct on liability but that the jury award was erroneously low. Upon review of the entire record, we find that the jury findings, notwithstanding that conflicting evidence was presented, were reasonable and we affirm them.
It is well settled that, on appellate review of a factual determination, the reviewing court may not set aside a factual determination made by the trier of fact in the absence of manifest error or unless it is clearly wrong. Also, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Canter v. Koehring, 283 So.2d 716 (La.1973). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State through DOTD, 617 So.2d 880 (La.1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra.
*733 In the present case we are called upon to determine whether the jury findings are manifestly erroneous. The jury made the following findings: (1) that Guaranty agreed to provide financing to GTI in excess of the initial $100,000; (2) that Guaranty breached that agreement; (3) that Guaranty breached its obligation and acted unreasonably in threatening to call GTI's accounts receivable customers and demanding immediate payment of GTI's $100,000 note; and (4) that Guaranty was liable for $255,000 because of its actions.
In reviewing the record, it is clear that both sides presented conflicting testimony and evidence on the above points. Accordingly, the jury was called upon to access and evaluate credibility and to draw factual inferences.
Guaranty presented evidence that Melancon, in communication with Garlepied, had a lending limit of only $40,000 and that he had communicated that to Garlepied. In support of this, Guaranty introduced documents concerning the $100,000 line of credit, indicating that approval for that loan had gone through a loan committee and was originally deferred, absent additional collateral that Garlepied provided. Guaranty further proved that GTI did not immediately draw the full $100,000, and, at the time Melancon wrote the letter to the ICC, GTI had only drawn $25,000 of the line of credit, with a remaining commitment for $75,000. Thus, Guaranty stated that the letter Melancon wrote to the ICC was referring to the remaining $75,000 and not to any additional funds. There was testimony that Garlepied and Melancon did discuss the possibility of GTI borrowing an additional $500,000. Pursuant to that, a meeting was called with Garlepied, Melancon and Mr. Mogilles, the bank's credit analyst. The discussions at that meeting centered on GTI's ability to repay its $100,000 loan, rather than on future loans. There was testimony of Guaranty's concern over GTI's lack of repayment of principal on the line of credit, although the loan was not in default. There was also testimony concerning GTI's tardiness in complying with the bank's request for financial statements and monthly reports.
Melancon testified that, in early November 1981, he received a telephone call from the IRS in which he was told that GTI owed $90,000 in payroll taxes and that the IRS was going to seize GTI's assets held by the bank as collateral for their loan to GTI. Melancon notified his superior, Mr. Falcone, of this phone call and the decision was made by to demand payment of the $100,000 loan and to notify Garlepied that the bank was going to notify the accounts receivable customers immediately if payment was not made. After Melancon informed Garlepied of Guaranty's decision, GTI filed a Chapter 11 petition in bankruptcy court. Guaranty cited evidence of earlier financial dealings between Garlepied and Melancon, attempting to show that Garlepied was knowledgeable in banking transactions and was aware of Melancon's limited $40,000 lending authority.
As to damages, Guaranty provided expert testimony that the trucking business generally was not on an incline at that time and that any lost profits that GTI might have suffered due to Guaranty's actions were negligible at best. Guaranty also attempted to prove that GTI was in such dire financial straits that regardless of the actions of Guaranty, GTI would have still ended up in financial ruin.
In contrast, GTI presented evidence that it was a growing trucking business, with steadily increasing sales from 1974 to 1978. GTI had obtained a small business loan from First Metropolitan Bank. Thereafter, its loan business was solicited by Melancon with Guaranty. In 1979, GTI obtained a $100,000 line of credit from Guaranty for working capital. Garlepied testified that Guaranty was well aware of GTI's financial situation and that the loan was for current operating expenses.
Garlepied stated that Melancon never told him that his lending authority was limited to $40,000 and indicated that he could make the $100,000 loan with no problem. Under cross examination Melancon could not recall exactly when he had informed Garlepied of his lending limit. There was other testimony that bank officers often do not inform their customers of their lending limits. GTI further introduced evidence to establish that Garlepied was not an experienced borrower. *734 In the past he had always dealt solely with his individual loan officer and had not had any dealings with a loan committee. All information was funnelled through Melancon.
GTI further introduced evidence that Guaranty was grossly over collateralized for the $100,000 loan, holding collateral valued by the bank at $366,000 and valued by GTI at $486,000. Thus, Guaranty held ample collateral to support an additional loan to GTI. Also, because Guaranty held GTI's major assets as collateral, GTI could not obtain a loan elsewhere. GTI further established that under the terms and conditions of the $100,000 line of credit loan, it was only required to make monthly interest payments which it did make. Thus, the loan was current. There was testimony that Melancon spoke publicly in favor of GTI's expansion. Garlepied testified that he discussed at length and in detail, with Melancon, GTI's financial needs in obtaining the expanded authority. He stated that their discussions were clear on the point that $500,000 in addition to the $100,000 already loaned would be necessary. The ICC application process was fully explained to Melancon, including that GTI must be able to show that it had adequate financing available for the expansion should it be awarded the expanded trucking authority. In connection therewith, Melancon sent a letter to the ICC, advising them that Guaranty had approved the necessary financing for the initiation of the expansion. Documents from the ICC indicate that it understood from Melancon's letter that Guaranty had committed to loan GTI the funds necessary for the expansion. Melancon attempted to explain his letter to the ICC by stating that Garlepied told him what to write and that he was referring to the remaining $75,000 that had not yet been drawn on the previously approved $100,000 loan. However, Mr. Martin, a former bank employee of First Metropolitan Bank, testifying as an expert in the field of banking and financial counseling, specifically financial counseling of trucking companies, stated that $100,000 would clearly not have been sufficient to finance the expansion. Further, the bank's own internal documents indicated that the $100,000 loan was for working capital and not for expansion.
GTI was granted the expanded authority in May 1981, based in part on Guaranty's commitment of finances. In September 1981, when Guaranty notified GTI that it would not finance the expansion, GTI had already initiated the expansion, exhausting all of its ready capital. Guaranty knew, at the time it notified GTI that it would not finance the expansion, that GTI would, without the financing, be doomed to failure. Then, on November 4, 1981, Garlepied was asked to meet with Melancon and was informed that, if the $100,000 loan was not paid by close of business that day, Guaranty intended to notify GTI's accounts receivable customers that the accounts were pledged. Such a tactic would have caused the customers to terminate their business with GTI. At that time, GTI was current in its payments and had no prior notice of the bank's dissatisfaction with its performance under the note. While Melancon's actions were purportedly precipitated by a call from the IRS, Melancon could not name the person who called him, did not verify that the caller was from the IRS, did not verify the truth of the information he was given involving past due payroll taxes owed by GTI and did not seek advice as to whether the IRS could seize GTI's assets pledged as collateral for the $100,000 loan.
The bank's own employee, Kermit Mogilles, testified that the bank has a responsibility to their customers to act reasonably and that it was unreasonable for the bank to call the loan, without warning, and expect immediate payment. He further stated that usually, when it determines that it wants to end its relationship with a customer, it gives the customer a reasonable length of time to allow the customer to seek financial assistance elsewhere and reposition the company. GTI was forced into bankruptcy as a result of Guaranty's actions.
Harold Asher testified as an expert in accounting. He testified that the total amount of damages suffered by GTI and Garlepied individually was $781,851 not including interest. This also did not include damages for loss of reputation, and mental anguish, pain and suffering. Garlepied personally lost his home, valued at $94,000, his *735 commercial immovable property, valued at $221,000, and $42,000 he had loaned GTI. GTI's damages were based on loss of income from projected sales at an approximate 12% annual increase, over a 3 and ½ year period. Mr. Romig, Guaranty's expert, testified to increases of approximately 2 to 2.5% annually, based on averages from data from the American Trucking Association.
After hearing all the testimony and viewing the evidence presented, the jury was called upon to assess credibility and make factual determinations. In ruling for Garlepied, the jury obviously drew their conclusions in his favor. We find that there was ample evidence in the record to support the jury's factual findings, perhaps most persuasive, the letter written by Melancon to the ICC upon which plaintiffs and the ICC relied in granting the expanded authority. Therefore, while contrary evidence was presented, we find no manifest error in the jury's factual determinations that a loan agreement existed between GTI and Guaranty in excess of $100,000 and that Guaranty breached that agreement. Likewise, the finding that Guaranty acted unreasonably in threatening to notify GTI's accounts receivable customers if the $100,000 loan was not repaid by the close of business that day is fully supported by the record and was not manifestly erroneous.
Guaranty argues that the trial court erred in charging the jury that a bank has an obligation to act reasonably in its relationship with its customers and in submitting a jury interrogatory which asked if the jury found that Guaranty acted unreasonably in threatening to call plaintiff's accounts receivable customers. We find no merit in this argument under the facts presented. While a bank ordinarily has no independent duty of care imposed on its relationship with a depositor, special circumstances between the bank and depositor, will give rise to such a duty. Greene v. Gulf Coast Bank, 593 So.2d 630 (La.1992); Trans-Global Alloy Ltd. v. First Nat'l Bank of Jefferson, supra. Guaranty, through Melancon, was deeply involved in GTI's financial arrangements and expansion plans, encouraging the expansion with the promise of future financing, and was pledgee of GTI's accounts receivables as well as other assets making a loan elsewhere impossible for GTI. Furthermore, Guaranty was well aware of GTI's financial situation and knew that calling the loan would bankrupt the company and yet proceeded without verifying the IRS call or any information regarding the call. Furthermore, Guaranty's arguments on this issue only pertain to the demand note, and fail to take into account the bank's duty on the security instruments. La.R.S. 6:1124, relied on by Guaranty in support of its argument, which provides that a fiduciary relationship between a financial institution and its customer will not be implied and must be in writing, was enacted in 1991 and is not applicable to the instant case.
Concerning the damage award, the amount of damages set by the jury, $255,000, fell between the $781,000 plus testified to by plaintiffs' expert and zero damages argued for by Guaranty. The award is fully supported by the record considering that GTI was an ongoing concern, that had just been awarded an expanded trucking authority from the ICC, evidencing the possibility for growth, when Guaranty abruptly terminated all financing to GTI. Therefore, the amount of damages awarded by the jury is affirmed.
However, we do note a problem in the damage award, in that the damages were awarded solely to Garlepied and not to GTI. We find that not awarding the damages to the company was legal error that requires amendment of the judgment.
It is undisputed that Garlepied is the person who dealt with Guaranty in securing the $100,000 loan and in communications regarding a further loan commitment for the expansion. However, the record indicates that he did so on behalf of the corporation, GTI. He signed the note as president of GTI, a Louisiana Corporation. Garlepied's personal claims are based on the obligations owed by Guaranty to GTI, and on Garlepied's losses as an employee and shareholder of the corporation, and are, therefore, derivative.
In Trans-Global Alloy v. First Natl. Bank, 564 So.2d 697 (La.App. 5th Cir.1990), reversed on other grounds, 583 So.2d 443 (La.1991), this court addressed a factual situation very similar to the case at bar. Therein *736 a corporation and its sole stockholders, who were also officers of the corporation, sued the defendant bank claiming damages as a result of the bank's failure to provide agreed upon financing necessary for the corporation to fulfill its contract with a third party. The jury returned a verdict in favor of the plaintiffs based on the bank's breach of a contractual obligation between it and the corporation. The jury also awarded damages to the individual stockholders finding that the breach caused them to file for personal bankruptcy. The trial court granted a judgment notwithstanding the verdict, holding that the individuals had no right of action for breach of an obligation owed to the corporation. On appellate review, this court affirmed the lower court judgment, despite the fact that the officer/stockholders were personally liable on the loan between the bank and the corporation. In doing so, the court reasoned:
As this Court stated in Hinchman v. Oubre, 445 So.2d 1313 (La.App. 5 Cir.1984), 445 So.2d at 1317:
If a corporation has sustained a loss then only that corporation can sue to recover it. * * * A person who conducts business in corporate form and reaps the benefits of incorporation cannot sue individually for damages incurred by the corporation. * * * [Citations omitted.]
As stated in the trial court's well reasoned analysis, although the jury found that FNJ breached an obligation to TGA, it also found this breach caused Wyatt and Naquin's personal bankruptcies and found FNJ liable to them. This was error, because "a corporation is an individual being, separate and distinct from the individuals who compose its membership. Consequently, any debts and obligations due to a corporation are not due to the individuals who compose its membership."
Therefore, Wyatt and Naquin, as shareholders of the corporation, are not entitled to damages because they are separate legal entities from TGA, which is the only party entitled to recover.
We remain in agreement with our reasoning in Trans-Global and find it dispositive of the issue before us herein. Any obligation Guaranty owed in this case was owed to GTI and not to Garlepied personally. He signed the note in his corporate capacity. The corporation and Garlepied are separate legal entities, and any damages Garlepied may have suffered were derivative.[2] Accordingly, we find that the jury award of damages to Garlepied personally was legally erroneous and we amend the judgment awarding the damages of $255,000 to the corporation, GTI.[3]
Guaranty argues that the trial court erred in refusing to charge the jury on the law of error and fraud, and that error and fraud vitiate consent to an agreement. More particularly, Guaranty is arguing that they cannot be held to have breached any agreement with GTI because there was no legal agreement between the parties. Any agreement they may have had was induced through fraud and error by GTI's failure to disclose its tax situation with the IRS and, therefore, invalid. In view of the jury charge error, they request a de novo review of the facts by this court.
In response, GTI contends that Guaranty failed to object timely to the court's refusal to give the charge on error and fraud. Further, GTI contends that their financial records were opened to Guaranty and that nothing was concealed. GTI also objects to the jury charges and interrogatories insofar as the court did not submit to the jury issues raised by GTI concerning Guaranty's negligent misrepresentation, unfair and deceptive trade practices, detrimental reliance and intentional interference with corporate power.
First, it must be pointed out that Guaranty did make a timely objection to the charge based on the court's failure to charge the *737 jury on error and fraud. The objection was made before the jury retired and with reasons for the objection.
Adequate jury instructions fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. The instructions must properly reflect the law applicable to the particular case. Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5th Cir.1983), writ denied, 434 So.2d 1097 (La.1983). The mere discovery of an error in the court's instructions does not automatically justify a de novo review by the appellate court without first measuring the gravity or degree of the error and considering the instructions as a whole and the circumstances of the case. The manifest error standard may not be ignored unless the jury charges are so incorrect or so inadequate that the jury was precluded from reaching a proper verdict based on the law and the facts. Boh Bros. Const. v. Luber-Finer, Inc., 612 So.2d 270 (La.App. 5th Cir. 1992). We find no such error in the jury instructions in this case.
Rather, considering the testimony and evidence produced at trial, and the jury charges that were given, we find that the jury charges as a whole adequately apprised the jury of the applicable law in light of the facts of this particular case. First, error and fraud were not pled as affirmative defenses as required by La. C.C.P. art. 1005. Thus, they were not properly put at issue in this case. Furthermore, the charges that were given by the trial court gave an explanation of the law of contracts and the prerequisites to a binding contract and were adequate in light of the facts presented. Similarly, GTI alleges no prejudice in the court's refusal to give the charges which it complains of on appeal. The jury found that there was a binding contract between the parties, which we have affirmed, supra, making these charges unnecessary. When considered as a whole, we find that the jury charges and interrogatories submitted to the jury, were adequate as pertains to the facts presented at trial.
Next Guaranty argues that the trial court erred in refusing to allow evidence concerning the sale of the litigious rights to this lawsuit. More particularly, at trial, Guaranty sought to introduce evidence that the rights to pursue this lawsuit were sold in bankruptcy court to one company and then later purchased by another company owned by Garlepied. Guaranty sought to introduce this, both as evidence of the value Garlepied thought the lawsuit had and to show that any funds recovered would not pay GTI creditors but would end up in a new company owned by Garlepied.
In the discussions that ensued over admission of the evidence, the trial court expressed concern that the evidence was irrelevant and did not show Garlepied's personal valuation of the suit, but rather only showed the value the rights to the lawsuit were sold for in bankruptcy court which was not relevant to the issues before the jury in this case.
La C.E. art. 402, relating to relevant evidence, provides:
All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible.
La C.E. art. 403 on the exclusion of relevant evidence is also pertinent to the issue before us and provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, or waste of time.
It is well settled that the trial judge is afforded wide discretion in determining the relevancy and admissibility of evidence. A trial judge's ruling in this regard will not be disturbed in the absence of a clear showing of abuse of discretion. State v. Stowe, 635 So.2d 168 (La.1994); Fisher v. River Oaks, Ltd., 635 So.2d 1209 (La.App. 5th Cir.1994), writs denied, 637 So.2d 503 (La.1994). We find no abuse of discretion concerning this issue.
It is apparent from the record that the trial judge felt that the evidence concerning the sale of the rights to the lawsuit was *738 absolutely irrelevant insofar as it related to who would get the proceeds of a jury verdict in favor of plaintiffs. Further, he was concerned that the evidence was also irrelevant as to plaintiffs' damages because the sale of the litigious rights in bankruptcy court did not necessarily indicate the actual value of the rights, but was affected by the Trustee's interests in concluding the bankruptcy proceedings as well as other factors.
From our review, it is clear that this evidence would have been confusing to the jury and possibly misleading. It also lacked relevance to the issues presented at trial. Accordingly we find no clear showing of abuse in the trial court's ruling to exclude the evidence.
Finally, Guaranty argues that the trial court erred in awarding prejudgment interest. Guaranty argues that the date on which legal interest commences to run depends on whether the suit is characterized as "ex delicto", with damages running from date of demand, or "ex contractu", with damages running from date of judgment. In this case, it is argued that the damages, if any, were based on the breach of a promise or contract between the parties and, therefore, damages should only run from the date of judgment. Guaranty concedes, however, where the cause of action arises from a breach of duty growing out of contract, it is considered "ex delicto" and interest would run from the date of judicial demand.
GTI argues that under Trans-Global, supra, interest runs, whether "ex delicto" or "ex contractu", from the date of judicial demand, consistent with civil law doctrine that damages are viewed as reparation for the loss suffered and pre-judgment interest is merely an extension of the compensatory damages necessary to make a plaintiff whole. GTI argues further, however, that the trial court erred in setting the date of judicial demand as the date that Garlepied was added by fourth supplemental petition as a plaintiff instead of the date that the original petition was filed.
Upon review, we find that the trial court judgment awarding interest from the date of judicial demand was correct, but we amend the judgment, setting the date of judicial demand as April 4, 1983, the date the original petition was filed. As explained supra, this case is identical to Trans-Global. Accordingly, we find the ruling in Trans-Global, that interest runs from the date of judicial demand, applicable in the case sub judice. Moreover, finding no error in the jury finding that Guaranty acted unreasonably in threatening to call GTI's accounts receivable customers if the $100,000 loan was not paid in 24 hours, the damages derive from the breach of a duty growing out of a contract and are, therefore, "ex delicto", with interest being assessed from the date of judicial demand. Accordingly, we find no error in the trial court judgment awarding interest from the date of judicial demand. However, since we held above that the damages should have properly been awarded to GTI and not to Garlepied personally, the date of judicial demand would be the date that the original petition was filed on behalf of GTI and not, as set by the trial judge, the date on which Garlepied was added to the case as a plaintiff. Insofar as the trial court judgment is not in accord with our judgment herein it is amended, making the date of judicial demand the day on which the original petition was filed, April 4, 1983.
GTI's final argument concerns the trial court's assessment of costs. The trial court ordered that costs be paid by Guaranty. However, the court did not accept GTI's proposed cost schedule but rather assessed the following costs: "$100.00 for copying costs, $1,000.00 in expert fees, $1900.93 in jury costs and $1,479.69 in court costs." GTI argues that the trial court erred in refusing to assess full costs for copying, in the amount of $1,729.55, and full expert witness costs of $19,885.00.
Guaranty argues that GTI is only entitled to copying costs insofar as the documents were introduced as exhibits at trial and is not entitled to the costs of all copies made in trial preparation. Guaranty also argues that the invoice of Harold Asher, plaintiffs' expert witness, did not provide a sufficient breakdown from which the court could assess the appropriate fee because fees for all of his time were not assessable as cost of the trial. Further, since only the prevailing party is *739 entitled to be reimbursed for costs, Guaranty notes that the cost invoices did not distinguish between which costs were for Garlepied personally and which were for GTI.
La.C.C.P. art. 1920, concerning the assessment of costs, provides:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
While it is the general rule that the party cast in judgment is taxed with all costs of a proceeding, the trial judge may assess the costs of a suit in any equitable manner and his assessment of costs can only be reversed by this court upon a showing of abuse of discretion. Lynch v. Hanover Ins. Co., 611 So.2d 121 (La.App. 5th Cir.1992), writs denied, 613 So.2d 996 (La.1993); Courtney v. Winn-Dixie Louisiana, Inc., 447 So.2d 504 (La.App. 5th Cir.1984), writs denied, 449 So.2d 1359 (La.1984). GTI has not made a sufficient showing in this case that the trial court abused his discretion in his assessment of costs. Some of the costs requested were not appropriate as not incurred as part of the trial, or not sufficiently specific as to which plaintiff the costs pertained. The trial judge was fully aware of the trial proceedings and the costs incurred and assessed them in his discretion. The assessment by the trial court is supported by the record. Therefore, we find no abuse of discretion in the assessment of costs by the trial judge.
Accordingly, for the reasons stated above, we amend the judgment in part, awarding the damages to GTI and making interest payable from the date of the original petition, and as amended, we affirm the trial court judgment casting Guaranty in judgment for $255,000 plus interest and costs as provided.
AMENDED AND AFFIRMED AS AMENDED.
GOTHARD, Judge, concurs.
I concur with the result in this case, but not necessarily for the reasons stated in the opinion. Specifically, I do not agree with that portion of the opinion which upholds the jury finding that Guaranty acted unreasonably in calling in the $100,000.00 demand note. Demand notes are payable on demand. It is my belief that the nature of a demand note does not give rise to any discussion of reasonableness.
NOTES
[1] An "operating authority" is a document issued by State and Federal Commissions authorizing a company to transport goods in certain areas.
[2] It should be noted that while Garlepied pleads as damages the loss of his home and other immovable property, these items were in fact collateral for the small business loan GTI had with First Metropolitan and did not secure the Guaranty loans.
[3] Our holding herein renders Guaranty's arguments on prescription of the inclusion of Garlepied personally as a plaintiff, in the fourth supplemental and amending petition, moot. Therefore, we will not address them.